467 P.2d 930

Elmer F. WAHL and Edward J. Smith, dba Wahl & Smith Refrigeration Company, Clinton Campbell Contractor, Inc., dba Phoenix Brick Yard, an Arizona corporation, Metropolitan Concrete & Materials Co., Ray Lumber Co., an Arizona corporation, and Smith Pipe & Steel Company, a division of the United States Freight Company, a Delaware corporation, Appellants,

v.

SOUTHWEST SAVINGS & LOAN ASSOCIATION, an Arizona corporation, Appellee.

No. I CA–CIV 80I.

Court of Appeals of Arizona, Division 1, Department B.

April 20, 1970.

Rehearing Denied May 19, 1970.

Review Granted July 7, 1970.

Cox & Hedberg, by John C. Hedberg, Phoenix, for Elmer F. Wahl and Edward J. Smith, Clinton Campbell Contractor, Inc., Metropolitan Concrete & Materials Co. and Smith Pipe & Steel Co.

Engdahl, Jerman, Butler & Estep, by Charles E. Butler, Phoenix, for Ray Lumber Co.

Renaud, Cook, Miller & Cordova, by Joseph B. Miller, Phoenix, for appellee.

HAIRE, Judge.

In this mortgage foreclosure action the trial court was required to determine the relative priorities existing between twenty-four separate mortgages and various materialmen's liens affecting the mortgaged realty. The trial court found that all of the mortgages constituted valid first liens, prior and superior to the liens of the various materialmen defendants. From this determination of priorities, the materialmen have appealed.

The case was determined by the trial court on the basis of an agreed statement of facts with various exhibits attached, together with documentary evidence, oral testimony and depositions admitted into evidence at the time of trial. There are no disputed facts. However, the appellants do question the sufficiency of the evidence to support the trial court's conclusions concerning the knowledge of certain of the materialmen relating to the existence of a portion of plaintiff's mortgages prior to the recording thereof.

In this opinion Southwest Savings & Loan Association, the appellee here and plaintiff in the trial court, will be referred to as Southwest or as the mortgagee. The various appellants, all of whom are claimants of materialmen's liens, will be collectively referred to as either appellants or lien claimants, and where necessary, by their individual names.

This action originated as an action by Southwest to foreclose twenty-four separate mortgages, each covering a separate parcel of real property described therein. The lien claimants counterclaimed to foreclose their alleged liens.

In July of 1963, defendant Arthur DeRose (the owner) was in the process of acquiring through a land trust a parcel of real property located within the town of Avondale, Arizona. He planned to construct an apartment complex consisting of twenty-four buildings on this parcel. In this complex, twenty-one buildings were to contain two apartments each, and three buildings were to contain four apartments each. The construction as to each of the twenty-four buildings was to be basically identical, the only variances being as to size and number of rooms.

The owner entered into a general contract with Becchetti Construction Company (the general contractor) for the construction of all twenty-four buildings. The

general contractor in turn made arrangements with the appellants and other suppliers for labor and materials to be furnished in the construction of the project. The general contractor obtained one building permit from the town of Avondale covering the construction of all the improvements. Only one laundry facility was constructed to serve all twenty-four buildings.

Also during this same period, July 1963, the owner successfully negotiated with Southwest for construction financing. The financing was to take the form of twenty-four separate loans, one for each of the apartment buildings involved. For mortgage purposes, the land was to be broken down into twenty-four separate parcels so that each mortgage would cover one building and the land upon which it was constructed. These twenty-four mortgages were executed and delivered to Southwest during August, 1963, but were not recorded at that time.

On September 9, 1963, a deed was recorded from the land trustee as grantor to the owner as grantee, conveying a substantial portion of the total parcel involved in the construction project. On the same date, Southwest recorded eighteen mortgages securing payment of eighteen of the twenty-four loans that had been committed. Each of these eighteen mortgages covered separate contiguous parts, but not the entire area of that portion of the land conveyed to the owner by the September 9, 1963, deed. The general contractor had not commenced construction, nor had any materials been furnished prior to the recordation of these eighteen separate mortgages.

On October 30, 1963, the owner acquired a deed from the land trustee for the balance of the property involved in the apartment project. On that same date, Southwest recorded six additional mortgages, which together covered all the land conveyed to the owner by this latter deed, as well as the unmortgaged balance of the land previously conveyed to the owner by the September 9, 1963, deed. Prior to the recording of these last six mortgages, twenty-one of the buildings were in various stages of construction, including three of the six buildings on the parcels covered by the last six mortgages. Although some of the lien claimants had delivered materials to the project prior to the recording of the last six mortgages, the trial court found as a fact that no materials were furnished by the lien claimants for the buildings covered by the last six mortgages until after the recording of these six mortgages.

Although the entire parcel upon which the apartment project was located was within the limits of the town of Avondale, there was no plat of this parcel recorded at the time of recordation of any of the mortgages referred to in this opinion, nor at the time construction commenced. Further, the boundaries of the lots designated in the plat which was subsequently recorded did not coincide with the boundaries of the above-mentioned mortgaged parcels.

Against this factual background the appellants raise various questions on appeal, the principal contention being that the trial court erred in holding that the liens of the six mortgages recorded on October 30, 1963, were prior and superior to the materialmen's liens asserted by appellants. The appellants have abandoned their original contention that their liens were also prior to the eighteen mortgages recorded before the commencement of any construction. Some of the questions presented for review by appellant Ray Lumber Company differ materially from the questions presented by the other appellants. These will be considered in a separate part of this opinion. Except as concerns the issue of priority, the following portion of the opinion relates primarily to questions raised by the other lien claimants, Elmer F. Wahl and Edward J. Smith, dba Wahl & Smith Refrigeration Company (Wahl); Clinton Campbell Contractor, Inc., dba Phoenix Brick Yard (Clinton Campbell);

Metropolitan Concrete & Materials Co. (Metropolitan Concrete); and Smith Pipe & Steel Company, a division of the United States Freight Company (Smith Pipe).

A.R.S. § 33–992, which governs priorities between materialmen's liens and other liens, mortgages and encumbrances, reads as follows:

"The liens provided for in this article, unless otherwise specifically provided, are preferred to all liens, mortgages or other encumbrances upon the property attaching subsequent to the time the labor was commenced or the materials commenced to be furnished. The liens provided for in this article are also preferred to all liens, mortgages and other encumbrances of which the lienholder had no actual or constructive notice at the time he commenced labor or commenced to furnished materials."

In an early decision the Arizona Supreme Court in interpreting this statute [1] held that where a general contractor contracts with materialmen and mechanics for the furnishing of labor and materials, the lien given by statute to these materialmen and mechanics relates back to, and attaches as of, the date of the commencement of the building or improvements by the general contractor, regardless of when the materials were actually furnished or the labor performed. Wylie v. Douglas Lumber Co., 39 Ariz. 511, 8 P.2d 256 (1932). We are unable to agree with Southwest's contention that the interpretation of this statute in *Wylie* was mere dicta. In any event, while

we might not have traveled the same route in legal analysis that the court traveled in *Wylie,* nevertheless we would have arrived at the same destination. In our opinion, the conclusion reached by the court in *Wylie* concerning the relation back of the materialmen's liens to the commencement of construction is a correct interpretation of the statute. Therefore, whether dicta or legal holding, we adopt and concur in the result reached in *Wylie,* and hold that under A.R.S. § 33–992, materialmen's and mechanics' liens resulting from materials furnished or labor performed at the instance of a general contractor relate back to, and attach as of, the date of commencement of construction of the improvement involved.

Before we can apply the above-stated principle to the facts at hand, we must determine when the general contractor commenced construction within the meaning of our lien statutes. Did he commence construction when work was started on the first apartment building, or did he repetitively commence construction anew each time work was started on a different building? If there had been a separate construction contract between the owner and the general contractor for each individual building, and if before any construction had commenced the parcel here involved had been broken down into various lots by a recorded map or plat, then in our opinion it would be clear under the provisions of A.R.S. § 33–992 construed together with A.R.S. §§ 33–981, subsec. A [2] and 33–991 [3] that for each such con-

---

1. The statute actually interpreted was § 2032, Revised Code of 1928. § 2032 of the Revised Code of 1928 is in all material respects identical to the statute presently in force, A.R.S. § 33–992.

2. A.R.S. § 33–981, subsec. A provides as follows:
   "A. Every person who labors or furnishes materials, machinery, fixtures or tools in the construction, alteration or repair of any building, or other structure or improvement whatever, shall have a lien thereon for the work or labor done or materials, machinery, fix-

tures or tools furnished, whether the work was done or articles furnished at the instance of the owner of the building, structure or improvement, or his agent."

3. A.R.S. § 33–991 provides in part as follows:
   "A. If the land upon which an improvement is made and labor has been performed lies outside of the limits of the recorded map or plat of a townsite, an incorporated city or town, or a subdivision, the lien shall extend to and include not to exceed ten acres of the

tract there would be a separate time of "commencement" of construction, dependent upon the date construction was actually commenced on the particular building or lot involved.

However, here we do not have such separate contracts or lots. Instead we have a single contract for the construction of several buildings on one parcel or lot. Although the parcel of land was located in the town of Avondale, it had not been broken down or subdivided into separate individual lots by any recorded plat or subdivision at the time construction was started pursuant to this single contract. The acreage of this total parcel is not stated as such in the record. However, from the dimensions set forth in various exhibits, it appears that the entire parcel included approximately five acres.

A.R.S. § 33–993 sets forth the procedures necessary to perfect the materialman's lien. One requirement imposed by this statute is that the lien be recorded within a specified time after the completion of the building or improvement involved. None of the parties quarrels with the trial court's conclusion of law that for the purpose of determining when the buildings or improvements were completed, the twenty-four building project was to be treated as one improvement, and that recording within the specified time after the "completion" of the project was sufficient. This apparently was a partial adoption by the trial court of the appellants' "one project" theory. We believe that under the facts of this case the trial court's conclusion was correct, and that the same reasons which support that conclusion concerning "one project" for time of completion are equally applicable in determining the "one project" for time of commencement of construction. The unitary nature of the project, including the fact that there was a single contract for construction and no recorded map or plat, requires this Court to conclude that for the purposes of lien accrual under A.R.S. § 33–992, the date of commencement of construction was the date construction was first started on the project.

■ Applying the holding of Wylie v. Douglas Lumber Co., *supra*, to these facts, appellants' liens attached to the entire parcel at the time construction was commenced by the general contractor on the first building, subject of course to the priority given by A.R.S. § 33–992 to Southwest's eighteen previously recorded mortgages covering a portion of the parcel. Moreover, even if we disregard the "one project" theory, under the admitted facts construction had been commenced on that portion of the parcel which was later covered by these six mortgages well before these mortgages were recorded.

However, Southwest urges, and apparently the trial court agreed, that it was required to give these six mortgages priority because of the lien claimants' actual knowledge of the existence of these mortgages.[4]

land upon which the improvement is made and the labor has been performed.
"B. If the land on which an improvement is made or labor has been performed lies within the limits of a recorded map or plat of a townsite, an incorporated city or town, or a subdivision, the lien shall extend to and include only the particular lot or lots upon which the improvement is made and the labor has been performed."

4. The trial court's finding of fact no. 21 reads as follows:
"21. Each of the lien claimants, with the exception of Smith Pipe and Clinton Campbell, had actual knowledge of the fact that Southwest had mortgages on the real property on which the apartment buildings were constructed or had knowledge of sufficient facts to impose upon them a duty of inquiry of either Southwest or the owner or general contractor and any inquiry would have resulted in actual knowledge of the mortgages of Southwest. As to Smith Pipe and Clinton Campbell, the constructive notice imparted by the 18 mortgages recorded in September of 1963 and the fact that these claimants treated all 24 apartment buildings as one project for lien purposes, gave them knowledge of sufficient facts to place upon them a duty of inquiry of either Southwest or the owner or general contractor and any inquiry would have resulted in actual knowledge of the mortgages of Southwest."

If we assume that the evidence is sufficient to support this finding, we fail to see its materiality. In *Wylie*, the general contractor commenced work on January 5th, by starting a force of men to excavate for foundations. The mortgage was thereafter recorded on January 7th. The earliest lien claimant began delivering materials and doing work a few days after January 7th. Thus, without question, at the time the lien claimants in *Wylie* began furnishing materials and doing work they had constructive notice of the mortgage because of its prior recordation. This constructive notice in *Wylie* was at least equivalent to any notice or knowledge arguably possessed by the lien claimants here. However, notwithstanding this constructive notice, the court in *Wylie* held that the liens were superior to the mortgage because these liens related back to, and attached as of, the time of the commencement of improvement by the general contractor. The application of this principle to the facts herein results in priority for the lien claimants over Southwest's six later recorded mortgages. There is no evidence that any of these lien claimants had actual or constructive notice or knowledge of these six mortgages at the time their liens attached, that is, *at the time the general contractor commenced construction on the project*. We believe that Wylie correctly construed the second sentence of A.R.S. § 33–992 [5] as not applying to actual or constructive knowledge acquired by materialmen or mechanics after the commencement of construction by the general contractor, because, by that time, through the application of the "relation back" doctrine, their lien rights have already attached. In other words, the phrase "at the time he commenced labor or commenced to furnish materials" has reference to the time the general contractor commenced labor or commenced to furnish materials and thus to the time the lien attaches, and not

to the time the materialman actually furnished the materials.

Although, as previously stated, we do not believe that the trial court's finding of fact no. 21 is material, we have nevertheless reviewed the record and are of the opinion that the evidence does not support the conclusions set forth therein. The evidence shows that lien claimants Smith Pipe and Clinton Campbell had no actual knowledge of any of Southwest's mortgages. These lien claimants did have constructive notice of the previously recorded eighteen mortgages. However, there was nothing in these eighteen recorded mortgages which in any way referred to the other six mortgages or gave any indication that Southwest had mortgages on the remaining portion of the parcel. Thus there was nothing to place upon them any duty of inquiry. As to lien claimants Metropolitan Concrete and Wahl, the evidence shows that they assumed or knew that there was some financing institution involved, but that they had no actual knowledge of any specific mortgages or the details of the financing.

Appellee cites Barringer v. Lilley, 96 F.2d 607 (9th Cir. 1938) and Phoenix Title & Trust Co. v. Stewart, 337 F.2d 978 (9th Cir. 1964), cert. denied, 380 U.S. 979, 85 S.Ct. 1335, 14 L.Ed.2d 273 (1965), as somehow casting a duty of inquiry upon the lien claimants. If we were concerned with the undisclosed rights of the trustee or beneficial owners under the trust, these cases might be pertinent. Stripped of all excess verbiage, appellee appears to be urging that the constructive notice given by the recording of its eighteen mortgages casts a duty upon anyone dealing with the property to inquire of the trustee, the owner or Southwest as to whether or not Southwest's interests covered more property than that disclosed by the eighteen recorded mortgages. As stated previously, if there had been some provision in these

---

5. "The liens provided for in this article are also preferred to all liens, mortgages and other encumbrances of which the lien-holder had no actual or constructive notice at the time he commenced labor or commenced to furnish materials."

recorded mortgages which referred to other or additional unspecified interests in Southwest, appellee's position might conceivably have some merit. But such was not the case.

In summary, there is no evidence that appellants had any notice or knowledge of Southwest's mortgages prior to the recording of the first eighteen of such mortgages. The constructive notice given by the recording of these eighteen mortgages, together with any other knowledge acquired prior to commencement of construction was certainly not sufficient to impart to these lien claimant's notice of the six later recorded mortgages. Any notice or knowledge acquired thereafter is immaterial, since appellants' liens attached at the time construction was commenced. We therefore hold that the trial court erred in concluding that appellants' liens had no priority over the six later recorded mortgages of Southwest.

Having determined that appellants' liens have some priority over Southwest's six later recorded mortgages, we now consider questions raised concerning the amount of that priority. In this connection the trial court's findings concerning the reasonable value of materials furnished by the lien claimants in the construction of the *entire* project and the amounts remaining unpaid were as follows:

(a) *Clinton Campbell*, total value $11,978.21, balance unpaid $2,833.73;

(b) *Metropolitan Concrete*, total value $15,543.94, balance unpaid $3,547.33;

(c) *Smith Pipe*, total value $18,018.47, balance unpaid, $18,018.47, amount claimed in lien, $17,964.76; and

(d) *Wahl*, total value $24,200.00, balance unpaid $12,537.63.

Prior to the filing of their liens, lien claimants Clinton Campbell, Metropolitan Concrete and Wahl received payment for a substantial portion of the materials which they furnished. Before receiving such payment these lien claimants gave lien waivers covering that portion of the realty covered by the eighteen mortgages first recorded. On the other hand, lien claimant Smith Pipe did not receive any partial payment nor did it give any lien waivers. Based upon these facts the trial court concluded that lien claimants Clinton Campbell, Metropolitan Concrete and Wahl had liens, inferior to Southwest's mortgages, upon each of the six buildings covered by the six later recorded mortgages to the extent of one-sixth of the unpaid balance of their liens. The trial court further concluded that lien claimant Smith Pipe had a lien, also inferior to Southwest's mortgages, on each of the twenty-four buildings in the project to the extent of one-twenty-fourth of the amount of the lien filed by Smith Pipe. Inasmuch as on this appeal we have concluded that the lien claimants are entitled to priority over the last six mortgages only, this lien apportionment by the trial court results in giving lien claimants Clinton Campbell, Metropolitan Concrete and Wahl priority over Southwest for the full unpaid balance due them. However, Smith Pipe would have priority for only six-twenty-fourths (that portion pertaining to the parcels covered by Southwest's six later recorded mortgages) of the balance due on its lien.

The lien claimants contend that the trial court should not have apportioned their liens against the twenty-four separate buildings. Apparently it is their position that each of them has a lien against the entire parcel covered by the project, and each and every part thereof, for the entire amount of the unpaid lien balance and that consequently each of them can enforce the full unpaid balance of his particular lien against that portion of the parcel upon which he has priority.

Actually it appears that there were three different ways in which the trial court could have disposed of the questions relating to the amount of appellants' lien priority. First, there was the possibility of finding that because of a lack of proof of the value of materials furnished to each individual building and specifically to the buildings concerning which appellants had priority, they had lost that priority. A

second possibility would be to adopt the theory advanced by appellants and give lien priority on the six buildings for an amount which included the value of materials not utilized in improvements thereon. The third possibility would be for the court to apportion appellants' liens so as to burden each of the twenty-four parcels of the property, as nearly as possible, with a lien equivalent to the reasonable value of the materials furnished in improvements on each such parcel. Of course, our problem is to determine which of these possible dispositions is correct under the facts and the law. The trial court apparently elected to follow the third possibility, and apportioned appellants' liens.

Many cases may be cited from other jurisdictions in which the courts have come to varying conclusions regarding the questions raised herein concerning apportionment. A detailed citation to and discussion of these cases would not be of any particular benefit because none has been found involving the application of similar lien perfection and priority statutes to fact situations sufficiently similar to the situation at hand to have precedent value. An excellent annotation entitled "Mechanic's lien for work on or material for separate buildings of one owner" and covering some 203 pages is found at 15 A.L.R.3d 73 (1967). (For cases most nearly in point involving the question of apportionment of a validly perfected lien, see particularly pages 106 through 118 of said annotation). Looking to our own statutes to determine whether or not apportionment is proper, A.R.S. § 33–981, subsec. A (footnote 2, *supra*) provides that the materialmen furnishing materials " * * * in the construction * * * of any building, or other structure or improvement whatever, shall have a lien *thereon* * * *." (Emphasis added). A.R.S. § 33–991 (footnote 3, *supra*) specifies that this lien "shall extend to and include" certain land, the extent of land included being dependent upon whether the improvement is within or outside the limits of a recorded map or plat of a townsite, an incorporated city or town,

or subdivision. From the language used in these statutes it is clear that the intent of the legislature was to give mechanics and materialmen a lien against the building or improvement primarily and incidentally against land upon which the building or improvement is located. Hayward Lumber & Investment Co. v. Graham, 104 Ariz. 103, 449 P.2d 31 (1968).

If the intent was to give a lien primarily against the building or improvement, then where differing priorities are involved and multiple buildings or improvements are constructed in one project, logically the lien values for priority purposes must be determined by reference to the value of materials furnished for each particular building. If the only determination involved here was a determination of lien rights between the owner and these lien claimants, there might possibly be no prejudice to anyone in allowing the lien claimants to assert the full amount of their liens against the complete project or a particular building or buildings without reference to values contributed. However, here we do have other interests and differing priorities involved.

The interrelation of these various interests and priorities makes it difficult to determine the proper application of our lien statutes. However, based upon the language of A.R.S. § 33–981, subsec. A (footnote 2, *supra*), we have concluded that the primary intent of the legislature was to relate mechanics' and materialmen's liens to the particular building or improvement to which their services or materials have contributed value. Further, we do not believe that the legislature intended that the priority given by A.R.S. § 33–992 to mechanics and materialmen lien claimants would be greater in amount than the reasonable value of materials furnished for the actual buildings or improvements concerning which priority is granted. In the ordinary situation this interpretation would contemplate that the materialman prove the reasonable value of materials furnished for the specific improvement involved. Independent Meat Co. of Jerome v. Crane Co.,

21 Ariz. 1, 184 P. 992 (1919). However, under the facts here involved we do not believe that such specificity is required in order to keep viable the appellants' liens. Here the evidence is sufficient to provide a reasonable foundation for apportionment, and in our opinion the court correctly apportioned the liens in order to protect and given meaning to the priorities granted by the statutes. Subsequent encumbrancers should be entitled to assume that inchoate lien rights not yet recorded will not exceed the reasonable value of materials and labor actually furnished in the improvement of the specific property involved.

If, on the other hand, we were to adopt the lien claimants' contentions, we would be giving priority to these materialmen's liens over the six subsequently recorded mortgages, not only for the reasonable value of materials furnished for improvements on the parcel subsequently mortgaged, but also for the value of materials furnished on other construction on a separate parcel (separate at least insofar as concerns the mortgagee) concerning which the lien claimants admittedly have no priority. In our opinion this would be contrary to the language of A.R.S. § 33–981 previously quoted herein and would nullify to a large extent the priority provisions of A.R.S. § 33–992. The construction we adopt gives effect to both of these statutory provisions.

It might be contended that there is some inconsistency in the position we take herein, that is, that we adopt the "one project—one parcel" theory for lien perfection purposes and then later consider the project as involving two or more parcels for lien priority purposes. However, in our opinion the facts demand such treatment. While as against the owner and for lien perfection purposes there might have been only one parcel or "lot" involved at the time construction commenced, still, at that same time insofar as concerns the priorities of Southwest, the land was effectively divided into two parcels—one covered by the eighteen previously recorded mortgages,[6] and the other not covered by any recorded mortgages until after the lien claimants' rights attached. Thus, in order to protect and give meaning to the priorities given to Southwest by the statutes, even though the twenty-four building project may be treated as one improvement on one parcel *for lien perfection purposes,* still, in the *enforcement of this lien* the court must, where differing priorities are involved, view the property in the light of these priorities and for that purpose give effect to its status at the time these priorities attached thereto.

■ We therefore hold that the priority afforded to the appellant lien claimants over the six later recorded mortgages extends only to the reasonable value of materials furnished for construction of the six buildings on the parcel covered by these later recorded mortgages. As previously stated, we believe that the evidence is sufficient to provide a reasonable basis for apportionment so as to support appellants' claimed priority to that extent. Under the trial court's findings and the evidence there is no question but that the materials furnished by appellants and for which appellants claim a lien were actually used in the construction of the twenty-four buildings involved. Further, there is no question concerning the reasonable value of these materials or concerning the balance remaining unpaid. Although there is no evidence concerning the reasonable value of materials which went into a specific building, the parties did stipulate in the agreed statement of facts submitted to the trial court that the construction as to each of the twenty-four buildings was basically identical. Some further evidence of this basic similarity in construction is found in the fact that the principal amount of the construction mortgages covering the six buildings (one-fourth of the twenty-four buildings) on which appellants have priority was equal to approximately

6. In actuality the larger portion of this "one" parcel had been mortgaged of record as eighteen separate parcels. However, for priority purposes the result is the same as though one mortgage covered the entire sub-parcel.

27.29% of the total principal amount of the mortgages for all twenty-four buildings. Thus an apportionment of 25% of the total amount of materials furnished by appellants against these six buildings would appear equitable and not unfair to any of the parties. In our opinion this evidence, when considered with the other evidence previously set forth herein concerning appellants "one project" theory, was sufficient to justify an apportionment of appellants' liens against the twenty-four buildings involved. By applying this apportionment, appellants become entitled to lien priority on the six buildings covered by Southwest's six later recorded mortgages to the extent of six-twenty-fourths of the value of the materials furnished by them for the construction of the project. Since the balances remaining unpaid on the liens of appellants Clinton Campbell and Metropolitan Concrete are less than this amount, they are entitled to priority for the full amount of the unpaid balance. However, inasmuch as the unpaid balances of the liens of appellants Smith Pipe and Wahl exceed the prorated amount, they are entitled to priority on the said six buildings over Southwest only to the extent of the pro-rated amount (six-twenty-fourths) of the total value of materials furnished by them for the project.

## THE CLAIMS OF RAY LUMBER COMPANY

Two basic questions are presented for review by appellant Ray Lumber Company (hereinafter, Ray). First it is urged that the trial court erred in concluding that the claimed materialmen's lien of Ray was invalid because it was not perfected by filing within sixty days after completion of the buildings. The other question concerns the trial court's denial of Ray's claimed legal or equitable assignment of undisbursed loan proceeds.

▮ Concerning the question of the timeliness of perfection, under the provisions of A.R.S. § 33–993 Ray Lumber Company was required to record its notice and claim of lien "within sixty days after the completion" of the buildings here involved. There are no statutory provisions defining "completion" as used in A.R.S. § 33–993, nor are there any statutory provisions (common in many states) for the filing by the owner or general contractor of a "notice of completion" so as to provide a readily ascertainable date for the commencement of the sixty day period. The time of completion is therefore a fact question under Arizona law, and, at least where completed buildings are involved, the burden is on the lien claimant to establish that his lien was recorded within sixty days after such completion. Gillespie Land & Irrigation Co. v. Hamilton, 43 Ariz. 102, 29 P.2d 158 (1934).

As stated in the first portion of this opinion, the trial court found that for the purpose of determining the time within which mechanics' liens had to be perfected, the twenty-four apartment construction project was to be treated as one project. However, although the project admittedly had not been physically completed at the time Ray's lien was filed for record on August 3, 1964, the trial court nevertheless concluded that Ray's lien was not timely perfected because it was not filed within sixty days after the date of cessation or abandonment of work by the general contractor.

▮ While abandonment may be treated as completion for the purpose of determining when the lien must be filed, Hayward Lumber & Investment Co. v. Graham, *supra*; Raymond v. Agren, 44 Ariz. 327, 36 P.2d 797 (1934), such abandonment will not be presumed, but must be established by the evidence. See Annot., 64 A.L.R. 276 (1929), entitled "Abandonment of construction or of contract as affecting time for filing mechanics' liens." In Hayward Lumber & Investment Co. v. Graham, *supra*, the Arizona Supreme Court quoted with approval Stark-Davis Co. v. Fellows, 129 Or. 281, 277 P. 110, 64 A.L.R. 271 (1929) as follows:

"In order to constitute a permanent abandonment of the construction of the

building, so that the same would take the place of the completion mentioned in the statutes, there should be a cessation of operation, and an intent on the part of the owner and contractor to cease operations permanently, or at least for an indefinite period, or some fair notice to or knowledge of the abandonment by a lien claimant, either actual or implied." (277 P. at 112).

The only evidence from which the trial court could have found an abandonment on May 14, 1964, was the fact that on that date the general contractor ceased work and filed a voluntary petition in bankruptcy. Inasmuch as work continued up to and including May 14, 1964, it is clear that the project had not been abandoned prior to the date the petition in bankruptcy was filed. Under § 70(b) of the Bankruptcy Act, the trustee, who was appointed on the date the petition was filed, May 14, 1964, had a minimum of sixty days within which to either assume or reject the bankrupt's executory contracts. See 4A Collier on Bankruptcy § 70.43 [3] (14th ed. 1967); 9 Am.Jur.2d Bankruptcy § 944 (1963). We might point out that there is nothing in the evidence to indicate that the contract between the owner and the general contractor contained any provision which would automatically terminate or dissolve the contractual relationship upon the mere filing of a petition in bankruptcy. The first indication in the evidence which would tend to show abandonment of this executory contract by the trustee was on August 13, 1964, when the bankruptcy court entered its order allowing Southwest to proceed to foreclose its mortgages. This was ten days after Ray had filed its lien.

■ We have not found any cases which discuss the question of whether or not the mere filing of a petition in bankruptcy constitutes an abandonment for mechanics' liens purposes. While we would consider the filing of such a petition as a relevant part of the evidence on the issue of abandonment, abandonment primarily involves a determination of intent, *Hayward, supra*. Where, as here, there is no evidence of an intent to abandon prior to the filing of bankruptcy proceedings, then, in our opinion, the intent of the trustee becomes the pertinent fact to be determined. We do not believe that the mere filing of the petition in bankruptcy, without more, is sufficient evidence of such abandonment as can be equated to completion under our mechanics' lien statutes.

■ The holding in *Hayward* reversing the trial court because the evidence was not sufficient to sustain a finding of abandonment implies that the party urging abandonment has the burden of proving the same. Inasmuch as there was insufficient evidence to show that the trustee did abandon the project prior to the filing of Ray's lien, and inasmuch as Ray's lien was admittedly filed before the actual physical completion of the buildings, we hold that the trial court erred in holding that the Ray lien was not timely perfected.

In accord with our holding concerning the liens asserted herein by the other lien claimants, we also hold that the Ray lien has priority over Southwest's six later recorded mortgages for the unpaid balance due for materials furnished by Ray for construction of the six buildings on the property covered by these mortgages. However, here, unlike the situation involving the other lien claimants, there is no question of apportionment because the evidence clearly shows the reasonable value of materials furnished by Ray for each building, and the balance unpaid thereon. On four of the buildings covered by Southwest's six later recorded mortgages, Ray was paid in full and thus obviously has no remaining lien. On the other two Ray's lien has priority over Southwest's mortgages as follows:

Building A–1, Principal Amount $1,-600.00;

Building A–8, Principal Amount $1,-837.21.

On the remaining parcels, Ray has valid liens, inferior to the lien of Southwest's mortgages, as follows:

| Building | Principal Amount |
| --- | --- |
| A-2 | $ 1,600.84 |
| A-3 | 1,129.11 |
| A-4 | 1,564.49 |
| A-5 | 1,600.00 |
| A-6 | 1,426.04 |
| A-7 | 1,282.57 |
| B-3 | 1,168.35 |
| B-5 | 1,276.82 |
| C-4 | 1,084.59 |
| C-5 | 1,617.51 |

Ray next contends that the trial court erred in holding that Ray did not have a legal or equitable lien on the undisbursed mortgage loan proceeds. Construction loan agreements identical in form to those here involved were considered by the Arizona Supreme Court in Pioneer Plumbing Supply Co. v. Southwest Savings & Loan Association, 102 Ariz. 258, 428 P.2d 115 (1967), and the court there expressly held that the materialman had no equitable lien on the undisbursed loan funds under such agreement, when, because of default, the borrower would not have been entitled thereto.` See also Mid-State Electric Supply Co. v. Arizona Title Insurance & Trust Co., 105 Ariz. 321, 464 P.2d 604 (1970). No purpose would be served in reciting in this opinion the provisions of the construction loan agreements and the principles set forth in *Pioneer*. Suffice it to say that unless there was some other agreement or conduct of Southwest involved which would change the situation, the decision of the Arizona Supreme Court in *Pioneer* governs and Ray can have no interest in the undisbursed loan funds.

Ray contends that its position is different from that of the materialmen in *Pioneer* because of an assignment letter, dated February 20, 1964, from the owner to Southwest, which was accepted by Southwest. The material parts of this letter read as follows:

"Ref: Lots B-1, 2, 6, 7, & 8.
Lots C-1 through C-8 incl.
All of DIECI ESTATES in
Avoondale. [sic].

"Please accept this letter as your authority to pay One Thousand Six Hundred ($1,600.00) dollars direct to RAY LUMBER COMPANY, 4450 West Camelback Road, Phoenix, Arizona, from all of the next nineteen draws due us from the above mentioned loans, or until a sum of Thirty Thousand Four Hundred ($30,-400.00) dollars has been paid in full to Ray Lumber Co."

It is not contended that after the acceptance of the above letter Southwest paid any draws to the owner or general contractor without first extracting and paying to Ray the assigned amount. If such had not been done, Ray would certainly have some basis for a claim against Southwest. Nor is it contended that under the construction loan agreement the assignors (the owner and general contractor) could have recovered additional draws against the undisbursed loan proceeds from Southwest. In other words, the assigned amount was paid to Ray on all draws which became "due" to the assignors. Therefore, it is clear that Southwest complied fully with the obligations imposed upon it by the aceptance of this assignment.

Ray appears to contend that either the acceptance by Southwest of the assignment letter or some other undisclosed contract coupled therewith forms a basis for applying against Southwest the doctrine of promissory estoppel set forth in Glitsos v. Kadish, 4 Ariz.App. 134, 418 P.2d 129 (1966). We find nothing in the evidence which would support the application of the doctrine of promissory estoppel or any other theory, equitable or legal, which would support Ray's alleged claim against the undisbursed loan proceeds. Here Southwest complied in every detail with the promise impliedly made by its acceptance of the letter assignment. There were no other promises made. The trial court expressly found that "no evidence was introduced to establish that any employee or representa-

tive of Southwest made any misrepresentations or promises to any of the lien claimants involved in this action." Also, it should be kept in mind that practically all materials furnished by Ray to this project were furnished prior to February 20, 1964, the date of the assignment letter.[7] Thus, even if Ray did misconstrue its rights under the assignment, no contention can be made that in reliance upon such misconstruction it advanced any significant amounts of materials. Further, unlike the situation in *Glitsos*, Ray has not in any way lost its lien rights in reliance upon some promise made by Southwest. In summary, we find no basis in the evidence from which it could be concluded that Ray has any legal or equitable rights in the undisbursed loan funds

That portion of the trial court's judgment which is inconsistent with this opinion is hereby reversed. The matter is remanded to the trial court for the entry of judgment in accordance with the rights of the parties as set forth herein.

EUBANK, P. J., and JACOBSON, J., concur.

7. The only amounts furnished by Ray to the entire project after February 20, 1964, were as follows:

| | |
|---|---|
| Building A–1 | $ 28.03 |
| Building A–3 | 39.26 |