606 P.2d 421

WATSON CONSTRUCTION COMPANY,
a Minnesota Corporation, Appellant,

v.

AMFAC MORTGAGE CORPORATION,
an Oregon Corporation, Appellee
(two cases).

AMFAC MORTGAGE CORPORATION,
an Oregon Corporation, Appellant,

v.

WATSON CONSTRUCTION COMPANY,
a Minnesota Corporation, and Frederick
O. Watson, Appellees.

AMFAC MORTGAGE CORPORATION,
an Oregon Corporation, Plaintiff-Ap-
pellee and Cross-Appellant,

v.

WATSON CONSTRUCTION COMPANY,
a Minnesota Corporation, and Frederick
O. Watson and Janet Watson, Defend-
ants-Appellants and Cross-Appellees.

Nos. 1 CA–CIV 4050, 1 CA–CIV 4051, 1
CA–CIV 4212 and 1 CA–CIV 4465.

Court of Appeals of Arizona,
Division 1,
Department B.

Oct. 4, 1979.

Rehearing Denied Dec. 17, 1979.

Review Denied Jan. 8, 1980.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.C., by Jeffrey B. Smith, P. Michael Whipple, Phoenix, for appellant and cross-appellees Watson Construction Co., Frederick O. Watson and Janet Watson.

Streich, Lang, Weeks & Cardon, P. A., by William S. Hawgood, II, Jeffrey L. Willis, Christopher D. Johnson, Phoenix, for appellee and cross-appellant Amfac Mortgage Corp.

OPINION

JACOBSON, Judge.

These multiple appeals originated in this court as separate and distinct appeals, were briefed separately by the parties and were individually argued before this court (except 1 CA–CIV 4212 and 4465 which were consolidated by this court after hearing separate oral argument on 1 CA–CIV 4050 and 4051). We have consolidated these appeals for opinion purposes for ease of understanding and presentation.

Before setting forth the legal and factual issues presented by these appeals, we wish to point out the problems rising from the indiscriminate use of Rule 54(b),[1] Rules of

---

1. Rule 54(b) provides in part as follows:
   "When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim or third-party claim, or when multiple parties are involved, the court may direct the entry of final judgment as to one

Civil Procedure, language in pre-final judgment orders.

All of these appeals arose out of a single multi-count complaint by Amfac Mortgage Corporation (Amfac), and a single amended answer and multi-count counterclaim filed by Watson Construction Company (Watson). All claims related to the same construction project. Two of these appeals (1 CA–CIV 4050 and 4051) arose out of the trial court's granting partial summary judgments which contained the applicable language of Rule 54(b), Rules of Civil Procedure. (A third partial summary judgment also containing 54(b) language between the parties was disposed of by Department A of this court in *Watson Construction Co. v. Amfac Mortgage Corporation*, 1 CA–CIV 3810, memo decision filed August 17, 1978.) While all of the claims and counterclaims were interrelated, this court has been forced to consider them piecemeal; has been required to read 440 pages of briefs (92 pages of which were single spaced); the parties have prepared 11 volumes of abstracts; and this court in order to be sure inconsistent opinions would not be rendered, has been forced to withhold decisions on these appeals until the final appeal was heard. While the various summary judgments which were entered may very well have been appropriate, the inclusion of 54(b) language therein has vastly increased the costs of this litigation and has duplicated appellate judicial time. We cannot urge the trial bench too strongly to use sparingly, in a case of this nature, the finality effect of Rule 54(b).

Turning now to the merits of the controversy before this court, the basic background facts underlying all of these appeals are that on July 11, 1973, Watson entered into a construction contract with Arizona Mall of Tempe, Inc. (Arizona Mall), which had been formed by a Mr. Orrin A. Ericson. Under this contract Watson agreed to construct a shopping center on certain real property located in Tempe, Arizona. One of the controversies between the parties centers on what constituted the terms of this agreement. Following execution of the construction contract, Ericson contacted representatives of Amfac as a potential lender of funds needed to purchase the real property involved and to finance the construction of the shopping mall.

Following negotiations between Ericson and Amfac, on August 7, 1973, Amfac advised Arizona Mall through a loan commitment letter that Arizona Mall's application for a loan in the amount of 22.5 million dollars had been conditionally approved. One of the conditions required by Amfac was that Arizona Mall obtain from Watson an "assignment" of the construction agreement between Arizona Mall and Watson. In response to this request, Watson, on August 24, 1973, sent Amfac a letter stating in part:

"We are the general contractor on the above referred to project pursuant to the terms of a construction contract dated July 11, 1973, (the 'Contract'), a true and exact copy of which is attached hereto as Exhibit 'A'. To induce you to make loans or advances to Arizona Mall of Tempe, Inc. ('Borrower') . . . we hereby agree that if the Borrower defaults in the performance of any obligations to be performed pursuant to the terms and conditions of any of the documents or instruments evidencing or securing your loan to it, we shall, at your request, continue to perform each and all of our obligations contained in the Contract in accordance with the terms and provisions thereof, provided we are paid in accordance with the terms of the Contract for all labor, services and materials rendered by us."

As previously indicated, a major dispute between the parties centers on what constituted the "contract" referred to in the letter of August 24, 1973 and what was attached as "Exhibit A" to that same letter. Suffice it to say at this point that Amfac contends that "Exhibit A" consisted of a

or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon the express direction for the entry of judgment."

"Standard Form of Agreement between Owner and Contractor" and pertinent attachments thereto which set forth a guaranteed maximum cost of construction of $16,854,900.00. Watson on the other hand contends that in addition there was attached as a part of "Exhibit A" a document which the parties have referred to as a "Side Agreement." This side agreement in essence provided that the guaranteed maximum price of $16,854,900.00 set forth in the "Standard Form of Agreement" was in fact based upon incomplete drawings and specifications and as between Arizona Mall and Watson, the guaranteed maximum price of construction would be adjusted as phases of construction were completed and complete plans and specifications became available.

On August 27, 1973, Amfac and Arizona Mall entered into an agreement whereby Amfac was to deposit monies in a building loan account, Arizona Mall executed a note in Amfac's favor and secured that note by a deed of trust under which Amfac was the beneficiary. This deed of trust was recorded.

With the financing secured, Watson commenced construction of the shopping mall. Subsequently, problems arose and Arizona Mall defaulted under the terms of its agreement with Amfac. Following the default, Amfac made attempts to salvage the situation, including a demand upon Watson to perform pursuant to its letter of August 24, 1973 at the guaranteed maximum price set forth in the Standard Form of Agreement. Watson refused and this litigation ensued.

Amfac's complaint against Watson and others sought basically the following relief:

(1) Foreclosure of its deed of trust and establishment of its priority of lien over Watson (this forms the subject matter of appeal No. 1 CA–CIV 4050), and

(2) a claim for breach by Watson of its August 24, 1973 letter agreement; a fraud claim against Watson and a claim for personal relief against Frederick Watson, president of Watson (this forms the subject matter of appeal No. 1 CA–CIV 4212).

Watson by amended counterclaim sought relief against Amfac for its alleged breach of the August 24, 1973 letter (this forms the subject matter of appeal No. 1 CA–CIV 4051). In addition, there has been an appeal and cross-appeal from the trial court's order settling costs and attorneys' fees (this constitutes appeal No. 1 CA–CIV 4465). Additional facts will be set forth which are specifically applicable to the disposition of the various appeals involved.

### 1 CA–CIV 4050

Under this cause number, Watson appeals from the trial court's granting of partial summary judgments foreclosing Amfac's deed of trust, determining the amounts due thereunder and denying Watson's request that its lien have priority over that of Amfac. In addition to the facts previously stated, the following facts are necessary to determine the issues presented by this appeal. Since these matters were disposed of by summary judgment, they will be stated in a light most favorable to Watson.

On August 27, 1973, the same day that Amfac and Arizona Mall entered into a building loan agreement, Amfac qualified with the Arizona Corporation Commission to do business in the state of Arizona. Negotiations between Amfac and Arizona Mall were carried on in Arizona before that date.

On August 28, 1973, the deed of trust between Arizona Mall as trustor and Amfac as beneficiary was recorded. This document did not contain a "caption" but on its first page it did refer to the document as a deed of trust. In addition, through inadvertence, the deed of trust recorded on August 28, 1973, did not contain pages 7 and 8 of the original document. It did, however, state the amount of the loan, identify the parties and describe the real property covered by the deed of trust. On October 16, 1973, Watson began construction of the shopping mall. In December, 1973, Amfac re-recorded its deed of trust "for the purposes of placing on public record pages 7 and 8 thereof."

Watson also alleges that it was induced by its letter of August 24, 1973 and Amfac's

subsequent loan commitment to begin construction on this project. In addition, it alleges that it received nine monthly payments from the loan proceeds and that Amfac's architectural representative approved two monthly payments which were not paid by Amfac, all during a time when Amfac's representative knew or should have known that funding problems and cost overrun were occurring on the project. Thus Watson contends Amfac should be estopped to assert the priority of its lien.

At the time Amfac refused to further fund the project it had disbursed approximately $4,644,000.00 in principal and had received $557,342.00 in interest and $225,000.00 as an initial loan fee.

Watson presents the following issues in this appeal:

(1) Whether the failure of the Deed of Trust recorded on August 28, 1973 to contain pages 7 and 8 and a caption gives Watson's mechanic's liens priority,

(2) Whether Amfac's acts estopped it to claim priority over Watson's lien,

(3) Whether Amfac performed acts in Arizona prior to becoming qualified in Arizona so as to void its deed of trust, and

(4) Whether Amfac's interest rate was usurious which resulted in the forfeit of interest paid on the loan.

Watson first contends that Amfac's deed of trust recorded on August 28, 1973 was defective because of its failure to contain pages 7 and 8 and a lack of a caption. From this premise, Watson argues that such a defective instrument fails to give the required notice so as to establish priority over subsequent liens.

Turning to the lack of pages 7 and 8 (which pages contain the clauses of the deed of trust allowing foreclosure in the event of default) Watson relies on *Wahl v. Southwest Savings & Loan Ass'n*, 12 Ariz.App. 90, 467 P.2d 930, vacated in part, 106 Ariz. 381, 476 P.2d 836 (1970), in support of its contention that the deed of trust failed to establish priority over subsequent lienholders. Such reliance is misplaced. In *Wahl*, the mortgagee brought an action to foreclose 24 separate mortgages. Eighteen of these mortgages were recorded prior to commencement of any construction on the properties, while six were recorded after construction commenced. The mortgagee contended that its lien created by the six after recorded mortgages were prior to attaching material and mechanic's liens on the basis that the 24 mortgages represented "one project" and thus contractors were given constructive notice of the six mortgages by the already recorded 18 mortgages. Both the Court of Appeals and the Supreme Court held that there was nothing contained in the before recorded 18 mortgages that would give actual or constructive notice that six additional mortgages would be recorded so as to establish their priority over liens attaching prior to recording.

This is not the factual situation presented in this case. The sole issue here is whether the failure to include two pages of a recorded deed of trust renders that deed of trust defective for constructive notice purposes. Under the authority of *Carley v. Lee*, 58 Ariz. 268, 119 P.2d 236 (1941) we hold it does not. In *Carley*, a buyer and seller of real property recorded a memorandum of their agreement to sell which simply stated that the parties agreed to sell and purchase the property, described the property involved and gave notice where the entire agreement could be inspected. A subsequent judgment creditor of the seller contended that such a memorandum failed to give constructive notice to third parties of the rights claimed by the buyer. The court stated:

"It is objected that this instrument does not give the details of the agreement of sale. It does specifically, however, state that there is an agreement of purchase and sale between the parties, it describes the property, and states with certainty where the precise terms may be ascertained by those interested therein. It is not necessary to entitle an instrument to record that it be in any particular language. If its legal effect is such that it is of a character which the record-

ing statutes permit to be recorded, and its language sufficiently apprises third parties of the nature and substance of the rights claimed under it, it is constructive notice of such rights." 58 Ariz. at 272, 119 P.2d at 238.

The deed of trust involved here was obviously of a character entitled to be recorded. A.R.S. § 33–411. It set forth the names of the parties, the nature of the transaction, described the property involved, and stated the amount of indebtedness claimed by Amfac. In our opinion, this information was sufficient to "apprise[s] third parties of the nature and substance of the rights claimed" under the deed of trust and thus imparted constructive notice. The fact that the document recorded on August 27, 1973 did not contain all of the agreements of the parties does not destroy the constructive notice imparted by that document. A.R.S. § 33–416.

Watson next argues that the deed of trust was defective because it did not contain a caption as required by A.R.S. § 11–480 as then effective. At the times pertinent here, A.R.S. § 11–480 stated:

"All instruments presented to the county recorder for recordation shall have a caption briefly stating the nature of the instrument, such as warranty deed, release of mortgage, notice of bulk sale, and like captions."

The August 27, 1973 deed of trust did not contain a caption although the words "deed of trust" were contained on the first page and the County Recorder properly recorded this instrument under the proper index.

Watson argues that since A.R.S. § 33–412 provides that deeds of trust are void against subsequent creditors unless they are recorded "as required by law," the failure of the deed of trust to comply with A.R.S. § 11–480 is a failure "required by law" and thus void as to Watson.

■ In our opinion, the failure of the document to be captioned does not render it void as to subsequent lienholders, as long as the recorder accepts the document for recording and properly indexes the document. A.R.S. § 11–480 appears under Article 3

"Recorder" of Chapter 3, "County Officers" of Title 11, "Counties" of the code which deals with the enumerated duties and obligations of the County Recorder. For example, A.R.S. § 11–461 imposes upon the County Recorder the duty to "record any other instrument offered for recording provided the instruments meet the requirements of 11–480." Thus, A.R.S. § 11–480 becomes an instruction to the County Recorder as to what and where instruments are to be recorded. This is made clear by the subsequent amendment to A.R.S. § 11–480 which provides:

"The county recorder shall have no obligation to index any instrument under any subject index category maintained by the county recorder unless that category is included in the caption to the instrument."

That the County Recorder was not misled here is evidenced by the August 27, 1973 deed of trust being accepted for recording by the Recorder and being properly indexed under deeds of trust. As we previously held, upon such recording and proper indexing, it gave constructive notice to the world of its nature and substance.

Watson next argues that Amfac by its conduct is estopped to claim that the lien created by its deed of trust is prior to Watson's mechanic and materialmen's lien. In this regard, Watson points to two purported acts of Amfac giving rise to the estoppel: (1) accepting an "assignment" of the Arizona Mall construction contract with Watson by the letter of August 24, 1973, and (2) creating a construction fund and making payments therefrom when Amfac knew or should have known that cost overruns were occurring on the job.

■ In regard to the issue of estoppel, the rule is established in Arizona that:

"before the mechanics lien claimant can defeat the legal priority of a prior recorded mortgage, he must show that the mortgagee did something upon which he had a right to rely, and that he relied thereon to his detriment." *Pioneer Plumbing Supply Co. v. Southwest Savings & Loan Ass'n,* 102 Ariz. 258, 265, 428 P.2d 115, 122 (1967).

This court in *Watson Construction Co. v. Amfac*, 1 CA–CIV 3810, memorandum decision, filed August 17, 1978, was presented with basically the same contention by Watson's claim that it was entitled to an equitable lien upon the undisbursed funds in the building account held by Amfac. In determining whether Watson's letter of August 24, 1973 was a representation by Amfac so as to create an equitable lien, this court held:

> "We fail to see how Watson's letter of August 24, 1973, to Amfac could be a representation which would induce Watson to rely on the account for payment. The letter by its express terms was written as an inducement to Amfac to make a loan to Arizona Mall. Watson made all the representations. The letter contained no representations by Amfac and since there was no communication between Watson and Amfac aside from the letter, no representations by Amfac can be implied from the surrounding circumstances."

■ This memorandum decision established the "law of the case," (*see* former Rule 48, Rules of Supreme Court, now Arizona Rules of Civil Appellate Procedure, Rule 28(c)), that the letter of August 24, 1973 from Watson to Amfac did not constitute a representation by Amfac. Since as a matter of "law of the case" the letter did not constitute a representation by Amfac, it cannot form the basis of an estoppel against Amfac. *See Graham v. Asbury*, 112 Ariz. 184, 540 P.2d 656 (1975).

Likewise, in the 1 CA–CIV 3810 memorandum decision, the court was faced with the issue of whether the creation of a building fund by Amfac was an act upon which Watson could rely. In holding that it was not, the court relied upon *Pioneer Plumbing Supply Co. v. Southwest Savings & Loan Ass'n, supra,* and stated:

> "Amfac's creation of the Account [building fund] did not in itself entitle Watson to rely on it for payment for which Amfac never became liable due to Arizona Mall's default."

Again, it being the "law of the case" that the creation of the building account was not an act upon which Watson could rely, it will not support the imposition of the principle of estoppel.

We are thus left with a determination of whether Amfac's prompt payment of draw requests to Watson, when it is alleged that Amfac knew or should have known of the financing problems on the job, operates to defeat Amfac's deed of trust priority.

Watson has cited several cases[2] which hold that under certain circumstances a mechanic's lien will be given priority over a prior recorded lending mortgage. In both of the footnoted cases, the lender engaged in actions, not present here, such as assurances to inquiring subcontractors that funds existed to pay future claims or the lender itself taking over the project.

Watson has also cited the case of *H. B. Deal Const. Co. v. Labor Discount Center, Inc.*, 418 S.W.2d 940 (Mo.1967) in support of its proposition that payments by a lender under construction financing make interests of contractors performing that construction prior in time to a recorded deed of trust. While we could differentiate this case on its facts, it appears that Missouri has adopted a rule of law which holds that the creation of a building fund for future construction is an inducement upon which contractors and subcontractors can rely to defeat a prior recorded mortgage securing the fund. This is not the rule in Arizona, *Pioneer Plumbing Supply Co. v. Southwest Savings & Loan Ass'n, supra,* nor the law established in this case.

Two additional cases cited by Watson deserve comment: *National Bank of Washington v. Equity Investors*, 81 Wash.2d 886, 506 P.2d 20 (1973) and *J. I. Kislak Mortgage Corp. v. William Matthews Builders, Inc.*, 287 A.2d 686 (Del.Super.Ct.1972) aff'd, 303 A.2d 648 (Del.1973). Both of these cases turned upon a determination of whether the terms of the lending agreement placed a

---

**2.** *Palmer v. Crews Lumber Co.*, 510 P.2d 269 (Okl.1973); *Wichita Federal Savings and Loan Ass'n v. Jones*, 155 Kan. 821, 130 P.2d 556 (1942).

mandatory or optional obligation upon the lender to make future advances during construction. The rule of law being applied in both cases is summarized in *J. I. Kislak Mortgage Corp.*:

> "Generally, where the making of advances is obligatory upon the mortgagee, the mortgage receives priority over a mechanic's lien when the mortgage has been recorded before the mechanic's lien attaches, despite the fact that advances are actually given subsequent to this time. [citations omitted.] However, where a mortgage is recorded prior to the time that a mechanic's lien attaches to the property and it is optional with the mortgagee as to whether a future advance is to be made, and where the mortgagee has made an advance with knowledge of the fact that the mechanic's lien has already attached, to the extent of such later advances, the mortgage is inferior to the mechanic's lien. [citations omitted]." 287 A.2d at 688.

Watson has not argued that the lending agreement between Amfac and Arizona Mall made Amfac's duty to pay advances optional nor has it argued that the quoted rule is the law or should be the law in Arizona. In absence of argument on this issue, we deem the Washington and Delaware cases not to be apropos.

■ Since the law in Arizona is that the creation of a building fund is not an inducement upon which contractors can rely, we fail to see, logically how disbursements from that fund can create an inducement, absent some other act by the lender in connection with the disbursement. Knowledge by the lender of overruns, if such be the case, is not such an act as can be said to defeat the lender's prior recorded interest.

Watson next argues that Amfac performed acts in Arizona prior to becoming qualified to do business in Arizona and since the deed of trust was a consequence of those acts, that deed of trust is void. The only acts alleged are the negotiations between Amfac and Arizona Mall, leading to the execution of the deed of trust on August 27, 1973. As previously indicated, Amfac qualified to do business in Arizona on August 27, 1973.

■ Negotiations leading to a contract which is entered into after the party has qualified to do business in this state, do not, in and of themselves constitute "doing business" so as to avoid the contract. To hold otherwise would require all foreign corporations desiring to engage in business negotiations in Arizona to qualify as Arizona corporations even though those negotiations may prove fruitless. This contention is wholly without merit.

Finally in this appeal, Watson contends that the trial court erred in setting the amount due under Amfac's deed of trust as it was usurious.

■ Assuming Watson has standing as a mechanic's lienholder to question the usurious nature of a transaction between third parties (Amfac and Arizona Mall), an issue we do not determine,[3] we hold that Amfac's note was not usurious. To determine whether a loan is usurious, the entire length of the loan must be considered and not merely the period between receipt and acceleration of the note upon default. *Altherr v. Wilshire Mortgage Corp.*, 104 Ariz. 59, 448 P.2d 859 (1968). In this case the length of the loan was for 24 months. Using Watson's figure of $3,823,940.00 as disbursed principal and Watson's calculation of interest of $782,342.00, the actual allowable interest (18%) would yield an interest return over the 24 month term of the loan of the sum of $1,201,131.50. Thus, even using Watson's figures to determine principal and interest, the interest received by Amfac is not usurious.

The judgment of the trial court granting foreclosure of Amfac's deed of trust, establishing the amount due thereunder and establishing its priority over the lien of Watson is affirmed.

---

**3.** There is a split of authority as to whether a junior lienholder has standing to question the usurious nature of a loan held by a senior lienholder. *See* 1 G. Glenn, Mortgages, § 39.2 at 252 (1943); and 91 C.J.S. Usury § 131b at 724 (1955).

## 1 CA–CIV 4051

In this action, Watson appeals the trial court's granting of partial summary judgment in Amfac's favor on Count 13 of Watson's counterclaim. By this count, Watson sought to establish that its letter of August 24, 1973, to Amfac constituted an assignment of the construction contract between it and Arizona Mall to Amfac and thus Amfac "stepped into the shoes" of Arizona Mall, assumed all of Arizona Mall's contractual obligations to Watson and therefore was liable to Watson for Arizona Mall's breach of that construction contract.

For clarity, the pertinent portions of that letter [4] are repeated:

"To induce you to make loans or advances to Arizona Mall of Tempe, Inc. ('Borrower') to cover certain costs and expenses which will be incurred in connection with the construction of the Project, we [Watson] hereby agree that if the Borrower defaults in the performance of any of its obligations to be performed pursuant to the terms and conditions of any of the documents or instruments evidencing or securing your loan to it, we shall, at your request, continue to perform each and all of our obligations contained in the Contract in accordance with the terms and provisions thereof, provided we are paid in accordance with the terms of the Contract for all labor, services and materials rendered by us."

Watson has characterized this instrument as an "assignment" whereby the contract documents between Watson and Arizona Mall were assigned to Amfac and Amfac thereby became bound to perform Arizona Mall's obligation to Watson. The sole basis asserted by Watson for this construction is that in Amfac's conditional commitment letter to Arizona Mall, it required that Arizona Mall obtain an "assignment" of the construction contract to Amfac. From this premise, Watson argues that the August 24, 1973, letter constituted an "assignment". Regardless of what Amfac requested, we must determine what was

produced. When viewed in this perspective, we conclude that what was produced was not an assignment of the contract documents, but a unilateral promise by Watson to continue performance in face of Arizona Mall's breach.

Broken down into its component parts, Watson by this letter made the following assertions:

(1) Watson intended the letter as an inducement to Amfac to loan money to Arizona Mall;

(2) Watson agreed to waive any breach by Arizona Mall of the agreements between Arizona Mall and Amfac, and arguably the construction contract between Arizona Mall and Watson; and

(3) Watson agreed to continue performance of its construction contract regardless of Arizona Mall's breaches, provided it was paid.

In our opinion, this letter was a unilateral offer by Watson to Amfac which was accepted by Amfac when it made the loan to Arizona Mall. *See State Farm Fire and Casualty Co. v. Rossini*, 107 Ariz. 561, 490 P.2d 567 (1971). The unilateral character of Watson's promise is important. As is stated in 1 Corbin on Contracts § 21, at 52 (1963):

"In the case of a unilateral contract, there is only one promisor; and the legal result is that he is the only party who is under an enforceable legal duty. The other party to this contract is the one to whom the promise is made, and he is the only one in whom the contract creates an enforceable legal right."

Watson here is the only promisor. We have previously held both in this opinion under 1 CA–CIV 4050 and in the memorandum decision previously referred to, that the August 24, 1973, letter created no estoppel rights against Amfac in Watson's favor. In view of this and since Amfac had no other communications with Watson relative to this issue, no promises can be inferred on Amfac's part in favor of Watson. Thus, no

---

4. It is undisputed that the letter of August 24, 1973 from Watson to Amfac was the only communication between these parties until August 15, 1974, shortly before Arizona Mall's default.

"enforceable legal duty" was created against Amfac.

Watson argues, however, that Amfac's subsequent demand upon Watson to perform in accordance with the August 24, 1973, letter "ratified" the assignment. Since we have concluded that no "assignment" existed, it obviously cannot be ratified. Moreover, Amfac's request was simply a demand upon Watson to perform its unilateral promises. No additional rights were created by this act.

The trial court properly held that no enforceable contractual obligation existed in Watson's favor against Amfac by reason of the August 24, 1973 letter. The judgment of the trial court dismissing Count 13 of Watson's counterclaim is affirmed.

## 1 CA–CIV 4212

As we stated in 1 CA–CIV 4051, any cause of action arising from Watson's August 24, 1973 letter to Amfac accrued in Amfac's favor, not to Watson. The appeal under this heading deals with that aspect of Amfac's action.

Counts five and six of Amfac's complaint sought damages for the alleged breach by Watson of the August 24, 1973 letter. Count eight of that complaint sought damages resulting from alleged fraudulent representation and omissions by Watson and Frederick O. Watson individually and count seven of the complaint sought to impose individual liability on Frederick O. Watson on an alter ego theory. The matter was tried to a jury which returned verdicts in favor of Watson on the breach of contract and fraud counts, thus obviating the necessity of returning a verdict on the alter ego theory. The jury did not return a verdict either way on the fraud count against Frederick O. Watson individually. The trial court, however, entered judgment in his favor on this issue. Amfac has appealed.

As previously indicated in this opinion, the main controversy concerning the breach of contract between Watson and Amfac centered, not on whether contractual obligation was created by the August 24, 1973 letter, but on what was the maximum price Watson was to receive for performance of the construction. As the August 24, 1973 letter stated, Watson's promise to Amfac to continue construction in the event of Arizona Mall's default was conditioned upon Watson being "paid in accordance with the terms of the contract." It was Amfac's position that the original contract documents between Arizona Mall and Watson, obligated Watson to perform the construction at a guaranteed maximum cost of $16,-854,900.00, or that by reason of a change order executed by Watson and Arizona Mall on March 25, 1974, some five months after construction started, the guaranteed maximum cost of construction was set at $12,-642,134.00. Watson, on the other hand, contended that its compensation for construction was set by an undated agreement between itself and Arizona Mall which provided that the cost of construction would be adjusted as completed plans and specifications became available. Watson further contended that Amfac was aware of this "side agreement", that it was attached to its letter of August 24, 1973 to Amfac and that it set the conditions under which Watson was to be paid. The contention continued that Watson owed no obligation to perform under its August 24, 1973 letter unless Amfac was willing to pay it in accordance with this side agreement.

The stage for this litigation was thus set. After Arizona Mall's default, Amfac made demand upon Watson to perform in accordance with its August 24, 1973 letter at either the original guaranteed maximum cost, or as provided by the change order of March 25, 1974. Watson refused, citing the price set by the side agreement and stated it was willing to perform only if it was paid according to that agreement. Amfac refused and stopped funding. Watson stopped construction and everybody went to the courthouse.

Amfac agrees that a jury fact issue was presented as to whether the side agreement was attached to the August 24, 1973 letter and as to whether Amfac had knowledge of this letter prior to committing the funds in this transaction. However, Amfac does

contend that these issues, together with the issue of whether the change order of March 25, 1974 constituted an establishment of a new maximum guaranteed price of construction under the side agreement, were not adequately presented to the jury. In this regard, the trial court rejected both Amfac and Watson's requested instructions on the breach of contract claim and submitted to the jury the following instructions:[5]

"As to this [breach of contract] claim, the plaintiff has the burden of proving each of the following elements:

"(1) That there was a contract between plaintiff and Watson Construction Company.

"(2) That the plaintiff did, or was willing to perform its part of said contract.

"(3) That Watson Construction Company did not perform its part of said contract.

"(4) That plaintiff was damaged by defendant's failure to perform."

On appeal, Amfac contends that this instruction allows the jury (1) to speculate whether the August 24, 1973 letter constituted a contract, this being a determination that belonged solely to the court; and (2) to speculate as to what was the respective parties' "parts" to be performed under the contract without delineation of the parties' respective obligations.

As to the first contentions we hold that this issue was not properly preserved on appeal. Rule 51(a), Rules of Civil Procedure, provides in part that: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto . . . stating distinctly the matter to which he objects and the grounds of his objection." The failure before the trial court to raise a specific ground for objection precludes the arguing of that ground on appeal. *Edward Greenband Enterprises*

*of Arizona v. Pepper,* 112 Ariz. 115, 538 P.2d 389 (1975).

We have searched the record of both the court's "informal discussion of jury instructions"[6] and the plaintiff's "objections to jury instructions" and find that nowhere did plaintiff object to the court's breach of contract instruction on the ground that it allowed the jury to speculate as to whether a contract ever came into existence between the parties. We therefore do not reach the merits of this argument on appeal.

We also find that Amfac's second contention was likewise not properly preserved as an objection to the trial court's instruction on the breach of contract. While Amfac did object to the court's instruction on the grounds that it was "not going far enough", the deficiencies noted were: (1) that the instruction created confusion by not specifying whether knowledge by Amfac of the side agreement even if not attached to the August 24, 1973 letter would constitute a defense; (2) it allowed the jury to speculate on the unambiguous meaning of the term "guaranteed maximum price for cost," and (3) that the instruction would allow the jury to find that refusal by Watson to perform a guaranteed maximum contract was not a material breach.

None of these noted deficiencies are argued on appeal, with the possible exception of the third. As to this, in our opinion, given the broad encompassing language of the instruction and the arguments of counsel on this issue, we conclude the jury was not mislead into believing that even if it should find that Watson agreed, under its contractual obligation, to perform at a guaranteed maximum price, the refusal of Watson to so perform did not constitute a breach.

We also note that while the court's contract instruction was discussed in the "in-

5. By quoting this instruction we do not infer our approval of its terms under the issues presented by this litigation.

6. By stipulation, and with the court's approval, formal objections to instructions were made after the jury retired, a practice which is rightly subject to criticism. *Hiett v. Howard,* 17 Ariz. App. 1, 7, 494 P.2d 1347, 1353 (1972).

formal conference" prior to the jury being instructed, the issues raised by Amfac's brief or in their formal objections were not discussed with the court prior to the instruction being given. In short, the criticism now directed to the court's contract instruction was not presented to the trial court and thus we will not consider it on appeal.

Amfac did, however, properly object to and preserve for appeal the trial court's failure to give its requested instructions which would have presented to the jury the issue of whether, even if the side agreement was attached to the August 24, 1973 letter, the execution of the change order of March 24, 1974, complied with the terms of that side agreement. The pertinent portion of that requested instruction provided that the jury was to hold in favor of Amfac if it found by a preponderance of the evidence:

"[t]hat change order number two was intended by the parties to establish a total guaranteed maximum price for the shopping center pursuant to the terms of the three-page side agreement."

In our opinion, there was insufficient evidence to present to the jury the issue as framed by the requested instruction. The only reference made by Amfac in its briefs that evidence exists to support this instruction is that given by three construction experts who testified that in their opinion sufficient plans and specifications were in existence on March 25, 1974 to enable a contractor to quote a guaranteed maximum price. These same experts testified that the same was true as of July 11, 1973, the date of the original contract between Watson and Arizona Mall. This evidence, taken at face value, merely indicates that these experts could have given a guaranteed maximum price based upon existing plans and specifications. However, in the side agreement between Watson and Arizona Mall, those parties specifically agreed that existing plans and specifications did not constitute sufficient information to give a guaranteed maximum price. Moreover, these experts' testimony adds nothing to the issue of whether Watson and Arizona Mall *intended* the change order to be in conformity with the side agreement. The court need not submit instructions to the jury which are not supported by the evidence. *Southern Pacific Co. v. Baca*, 77 Ariz. 173, 268 P.2d 968 (1954). Again, we note that this particular issue was not mentioned in the informal conference on instructions preceding the submission to the jury.

Amfac next argues that Watson's counsel was guilty of improper jury argument. We have read the argument complained of and admit that in some respects, counsel's comments were improper. However, no objection was made to these arguments at time of trial, there was no request for admonitions, nor was a motion for mistrial made. The first time this issue was presented to the trial court, was after the verdict, at the motion for new trial. This is simply too late. The rule is that failure to timely object to misconduct in closing argument constitutes a waiver of error. *Beliak v. Plants*, 93 Ariz. 266, 379 P.2d 976 (1963).

We decline to characterize counsel's arguments here as the type which would allow the issue to be raised even in the absence of a timely objection. *See Young Candy & Tobacco Co. v. Montoya*, 91 Ariz. 363, 372 P.2d 703 (1962).

Finally, Amfac argues that the trial court failed to properly instruct the jury on the issue of fraud. At trial, Amfac's theory of fraudulent conduct by both Watson and Frederick O. Watson, individually, went, not to a fraudulent inducement to initially make the loan, but to fraudulent acts occurring subsequent to the loan being made. In particular, Amfac's theory was that in addition to specific representations, both Watsons were guilty of fraudulent omissions by failing to inform Amfac that:

(1) substantial cost overruns existed on the project;

(2) plans and specifications were not designed within budget figures;

(3) Watson knew the project could not be built for the guaranteed maximum represented by the change orders;

* (4) Watson made draw requests to appear that the project was within budget; and

* (5) the cost estimates on monthly draw requests were erroneous.

The trial court refused to instruct the jury that an "omission" could be considered by the jury as a representation, on the legal basis that the relationship between Watson and Amfac did not give rise to a duty on the part of Watson to disclose.

Without determining whether, under the facts presented here, a duty existed on behalf of Watson to make a disclosure, we hold that the trial court did not err in refusing Amfac's instructions as presented. Amfac's requested instructions would have delegated to the jury the issue of whether a duty to disclose existed.[7] The requested instruction concluded with the statement: "In determining whether the defendants had a duty to disclose omitted facts, you are instructed that:" The balance of the requested instruction is blank. Amfac, in its reply brief states ". . . the proposed instruction assumed that the trial court would also instruct the jury as to the necessary factual determinations for the existence of a duty."

This assumption is misplaced. The court is not required to give incomplete instructions, nor is it under a duty to give more complete instruction in absence of a request to do so. *Southern Arizona Freight Lines v. Jackson*, 48 Ariz. 509, 63 P.2d 193 (1936). We find no error in refusing the instruction as submitted.

Finally, Amfac objects to the trial court's refusal to give its requested instruction on "creating false impressions." The only objection voiced to the refusal to give this instruction was that: "It's directly supported by the evidence in the Arizona case of *Starkovich v. Noye*, 111 Ariz. 347, 529 P.2d 698 (1975)." A reading of the cited case would have revealed that the Superior Court held that a "false impression" instruction was not inconsistent with a general fraud instruction enumerating the nine elements of fraud. How this would have helped the trial court's determination of whether a false impression instruction should have been given under the facts in this case is not explained. This objection simply lacks the specificity required to preserve the issue on appeal. *See Edward Greenband Enterprises of Arizona v. Pepper, supra.*

The judgment of the trial court in this appeal is affirmed.

### 1 CA–CIV 4465

This appeal and cross-appeal questions the denial by the trial court of both Amfac's and Watson's request to assess attorneys' fees and costs against the other. In the various judgments which have been the subject matter of these appeals (together with other judgments in this matter which were not appealed) the trial court entered judgments which contained the following or similar language:

". . . the imposition of costs among the parties relating to the claims adjudicated in this judgment shall be determined at the conclusion of the trial of all issues between [Amfac] and [Watson]."

The one exception to this language was the judgment which foreclosed Amfac's deed of trust. In that judgment, the trial court ascertained that Amfac's costs amounted to $18,566.26, but the judgment continued: "which costs shall be assessed against the defendant herein [this included Watson] as determined by this court and as apportioned at the conclusion of the trial in this matter."

We have not been informed whether the sum of $18,566.26 was included in the gross amount recovered under the special execution and sheriff's sale held subsequent to the foreclosure judgment.

---

* We note that these two "omissions", if true, are in essence false "representations" which were covered by the trial court's instructions.

7. We likewise do not determine whether the obligation to determine "duty" is a matter of law for the court, or is a factual determination for the jury.

**584**

In any event, following the conclusion of the trial which was the subject matter of 1 CA–CIV 4212, both Amfac and Watson filed statements of costs with the trial court. Watson filed a statement seeking $34,094.66 in costs and $410,566.13 in attorneys' fees. This statement did not attempt to differentiate between costs or attorneys' fees incurred individually by Frederick O. Watson and those incurred by Watson, the corporate entity. Nor did it differentiate between costs incurred in losing efforts as compared to winning efforts. Amfac also filed a statement claiming $73,551.08 in costs, and $456,412.00 in attorneys' fees. As to its cost statement, Amfac attributed $46,099.25 to costs incurred prior to July 12, 1977 and $27,451.83 in costs incurred thereafter. July 12, 1977 is apparently the date of the last judgment in Amfac's favor.

Objections to both statements were filed and on May 11, 1978, the court entered its formal written order denying costs or attorneys' fees to either party, in essence, requiring both parties to bear their own costs and attorneys' fees. Both parties have appealed.

■ We may deal with the issue of attorneys' fees rather summarily. All parties' claims for attorneys' fees in this matter were based upon A.R.S. § 12–341.01. This litigation, except as to the claims asserted against Frederick O. Watson individually, was filed prior to September 1, 1976, the date A.R.S. § 12–341.01 became effective. In *U. S. Life Title Co. v. Soule Steel Co.*, 122 Ariz. 79, 593 P.2d 302 (App.1979), this court held that A.R.S. § 12–341.01 could not be applied to actions filed prior to September 1, 1976. This disposes of the claims of both Watson and Amfac for attorneys' fees.

■ As to Frederick O. Watson, Amfac did not assert claims against him individually until it filed its amended complaint on December 17, 1976. However, there is nothing in the statement of costs filed in this matter to indicate either that Frederick O. Watson individually incurred any costs or attorneys' fees or which costs or attorneys' fees were attributable individually to Frederick O. Watson's defense. As to Fred-

erick O. Watson, we hold that the statement of costs did not comply with Rule 54(f), Rules of Civil Procedure, which provides in part:

"A *party* who claims costs shall file a statement of *his* costs and serve a copy thereof on the opposing party." (Emphasis added.)

Having failed to individualize his costs and attorneys' fees, the trial court did not err in denying these items as to him.

The cost question as to the remaining parties presents a more difficult problem. A.R.S. § 12–341 provides:

"The *successful party* to a *civil action* shall recover from his adversary all costs expended or incurred therein unless otherwise provided by law." (Emphasis added.)

■ We start with the proposition that awarding of costs to the successful party under A.R.S. § 12–341 is mandatory. *Trollope v. Koerner*, 21 Ariz.App. 43, 515 P.2d 340 (1973). This mandatory assessment is relatively easy to apply in the situation where A sues B in a one count complaint and there is no counterclaim. Either A wins or loses and costs are assessed accordingly.

However, the difficulty of ascertaining who was the "successful party" in the multiple count complaint and multiple count counterclaim litigation is exemplified by the contentions of the parties here. Watson contends that it was the successful party since it prevailed on the only claim by Amfac which sought monetary damages against it. Moreover, as to Frederick O. Watson, individually, he was entirely "successful" in the only litigation involving him.

On the other hand, Amfac says that it is the "net" successful party since it prevailed on its foreclosure count against attacks by Watson to deny foreclosure and to establish Watson's priority of lien, and Amfac was successful in defending against all of the counterclaims asserted against it by Watson, some of which sought monetary damages. Amfac's contention, in a nutshell, is that it was "more" successful than Watson

and as a corollary argues that since the cost statute does not provide for apportionment of costs, it is entitled to its entire costs, including those incurred in its unsuccessful prosecution of its breach of contract and fraud claims against Watson.

Amfac's "net judgment" argument is derived from *Trollope v. Koerner, supra*, which involved a plaintiff collecting $791.75 on its complaint and the defendant collecting $500 on its counterclaim. The court held:

> "We hold that since the [plaintiffs'] recovery of $791.75 exceeded that of [defendants'] compulsory counterclaim recovery of $500, the 'net judgment' being in [plaintiffs'] favor for $291.75, the trial court erred in not awarding the 'successful' [plaintiffs] their costs." 21 Ariz.App. at 47, 515 P.2d at 344.

The *Trollope* rationale is consistent with both the theory that a successful plaintiff is entitled to his costs though the relief granted is less than that prayed for, *Barth v. A. & B. Schuster Co.*, 25 Ariz. 546, 220 P. 391 (1923), and with the underlying basis for awarding costs, that is, to indemnify a party against the expense of successfully asserting his rights in court. *In re Estate of Stavro*, 17 Ariz.App. 257, 497 P.2d 77 (1972).

If we were to apply the "net judgment" rule or the "winner take all" rationale without further analysis here, Amfac is clearly the "net" winner as it is the only party in this complex litigation who received affirmative relief (foreclosure of its deed of trust).

But to allow Amfac to recover from Watson some $27,000 plus in costs it incurred in its unsuccessful prosecution of a separate and distinct claim against Watson, runs counter to the proposition that costs are awarded to indemnify the expenses of successful litigation. Conversely, to allow Watson to recover from Amfac some $34,000.00 in costs, some of which were obviously incurred in the unsuccessful prosecution of its numerous counterclaims against Amfac runs counter to the same proposition. Moreover, it is somewhat difficult to apply the "net judgment" rationale of *Trollope* where non-money judgments are involved.

The court in this type of multiple count and multiple counterclaim litigation might be persuaded that the proper interpretation of the Arizona cost statute, which can be traced back to 1887, see Ariz.Rev.Stat. § 895 (1887), would require an apportioning of costs between winning and losing efforts where money judgments are not involved. However, neither party has requested such relief.[8] In essence, both parties have taken an all or nothing position both before this court and the trial court. As we have previously indicated, this runs counter to the underlying rationale of awarding costs to the successful party.

Under the limited circumstances presented here and because of the positions taken by the parties, we hold the trial court did not err in failing to award costs to either party.

Judgment affirmed.

SCHROEDER, P. J., and OGG, C. J., Division 1, concur.

---

8. While Amfac has divided its costs between those incurred prior to and after July 12, 1977, the costs listed after July 12, 1977, deal solely with costs incurred in the contract and fraud action, i. e., costs of trial transcripts and witness fees. However, deposition costs were all incurred prior to July 12, 1977, and presumably these costs included depositions relating to the contract and fraud actions which it lost.