799 P.2d 1362

**S.K. DRYWALL, INC., an Arizona corporation, d/b/a Sunland Drywall & Paint, Plaintiff–Appellee, Cross Appellant,**

v.

**DEVELOPERS FINANCIAL GROUP, INC., an Arizona corporation; Fidelity & Deposit Company of Maryland, a Maryland corporation, Defendants–Appellants, Cross Appellees.**

No. 1 CA–CV 88–382.

Court of Appeals of Arizona, Division 1, Department A.

May 22, 1990.

Review Granted Nov. 27, 1990.

John L. Dillingham, Phoenix, for plaintiff-appellee, cross appellant.

Nearhood & Associates by James R. Nearhood, Phoenix, for defendants-appellants, cross appellees.

## OPINION

SHELLEY, Judge.

On cross-motions for summary judgment, the trial court entered judgment for appellee S.K. Drywall, Inc. (Sunland) on a mechanic's lien discharge bond given by appellant Developers Financial Group, Inc. (DFG) and its surety, Fidelity & Deposit Company of Maryland. *See* A.R.S. § 32–1152(E). The trial court denied Sunland's request for an award of attorney's fees pursuant to A.R.S. § 12–341.01(A).

DFG appeals, challenging the validity of Sunland's underlying mechanic's lien. Sunland cross-appeals from the denial of attorney's fees.

The following issues are presented in the appeal and cross-appeal. Our answers are set forth in parentheses.

1) Is the legal description in Sunland's lien overbroad and therefore invalid? (It is not overbroad.)

2) Does Sunland's lien fail to identify sufficiently certain portions of the condominium development to which the lien was to attach? (The lien does not sufficiently identify the location of the ramada, models, and sales office.)

3) Is Sunland's lien invalid for failing to distinguish the amounts claimed under its separate drywall and stucco sub-contracts and did it fail to apportion the total among the individual condominium units? (The lien properly apportioned the amounts claimed to each building. It was not necessary to distinguish between the amounts claimed under its two sub-contracts.)

4) Is Sunland's lien time-barred with respect to all buildings except building 6? (It is time-barred except for building 6.)

5) Was Sunland eligible for an award of attorney's fees under A.R.S. § 12–341.01(A)? (No.)

## FACTS AND PROCEDURAL HISTORY

DFG is the owner and developer of the real property in question. The real property consists of a condominium project of seventy units built for separate ownership by individuals. The project includes a swimming pool, a ramada, landscaping, streets and driveways owned in common by the homeowners. The condominium units are grouped into separate buildings numbered 1 through 11 on the plat map. Building 2 consists of three condominium units and building 6 consists of four units. Each of the remaining buildings consists of seven units.

On October 30, 1985, Drongo, Inc., not a party to this appeal, contracted with DFG to build eleven condominium buildings, the landscaping and pool area, and off-site improvements. DFG's contract with Drongo provided a contract price of $3,241,320. The contract price was itemized in thirteen separate schedules, one for each of the eleven buildings, one for the landscaping and pool area and one for off-site improvements.

Article 4.1 of the contract provided:

Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract sum to the Contractor as provided in the Contract Documents for the period ending the 25TH day of the month as follows:

PROGRESS PAYMENTS SHALL REFLECT 100% OF MATERIALS, 90% OF MAJOR SUBCONTRACTED TRADE. AFTER 50% OF THE WORK IS COMPLETED, PROGRESS PAYMENTS SHALL REFLECT 100% OF MATERIALS AND 95% OF MAJOR SUBCONTRACTED TRADE.

THE RETENTION SHALL BE PAID WITHIN THIRTY (30) DAYS AFTER OCCUPANCY OF ANY UNIT IN A GIVEN BUILDING AND NOT MORE THAN NINETY (90) DAYS AFTER ACCEPTANCE OF EACH BUILDING BY THE OWNER.

PAYMENTS WILL BE MADE ON OR BEFORE THE 10TH OF EACH MONTH ON PERCENTAGE OF COMPLETION WITH LIEN WAIVERS FOR THE PREVIOUS MONTH WITH CURRENT MONTH BILLING.

Article 5.1 of the contract provided:

Final payment, constituting the entire unpaid balance of the Contract Sum, shall be paid by the Owner to the Contractor when the Work has been completed, the Contract fully performed, and a final Certificate for Payment has been issued by the Architect.

On November 13, 1985, Sunland and Drongo entered into a subcontract for drywall, labor, and materials. Under the subcontract, Drongo agreed to pay Sunland a contract price of $211,100.00, determined as the sum of $2,127.00 for the ramada, $9,038.02 for building 2, $11,859.28 for building 6, and $20,897.30 each for buildings 1, 3 through 5, and 7 through 11. Article 3.1 of the subcontract provided in pertinent part:

ATTACHED IS A TYPICAL BUILDING SCHEDULE. THE SUBCONTRACTOR SHALL ADHERE TO THIS SCHEDULE AND COMPLETE THE VARIOUS PHASES OF WORK IN THE TIME ALLOTTED. THE SUPERINTENDENT SHALL PROVIDE THE SUBCONTRACTOR WITH ADVANCE NOTIFICATION OF ACTUAL COMMENCEMENT DATE FOR VARIOUS PHASES OF THE WORK AND MAY MODIFY THE CONSTRUCTION SCHEDULE FROM TIME TO TIME AS DEEMED NECESSARY TO COMPLETE A BUILDING IN 19 WEEKS.

Article 5 of the subcontract required Drongo to make monthly progress payments to Sunland, and required Sunland to submit applications to Drongo for monthly progress payments on or before the twenty-fifth day of each month. Article 5.2 provided in pertinent part:

BILLING APPLICATIONS MUST BE ACCOMPANIED BY LIEN WAIVER FOR PREVIOUS MONTHS PAYMENT, UNLESS PREVIOUSLY SUPPLIED. PAYMENTS WILL BE 90% OF THE CURRENT MONTHS COMPLETED LABOR, MATERIAL AND EQUIPMENT COSTS. PRIOR TO FIRST PAYMENT APPLICATION, SUBCONTRACTOR SHALL PROVIDE A LIST OF SUPPLIERS OF $1,000.00 OR MORE OF MATERIAL, EQUIPMENT AND LABOR AND LIEN WAIVERS WILL BE REQUIRED FROM THESE SUPPLIERS.

Article 6.1 provided that final payment of the contract sum would be made when Sunland fully completed the work satisfactorily to the architect. Retention payments were to be made as follows:

RETENTION SHALL BE PAID WITHIN THIRTY (30) DAYS AFTER OCCUPANCY OF ANY UNIT IN A GIVEN BUILDING AND NOT MORE THAN NINETY (90) DAYS AFTER ACCEPTANCE OF EACH BUILDING BY THE OWNER, PER THE GENERAL CONTRACT.

On November 19, 1985, DFG recorded its "Declaration of Horizontal Property Regime/Condominium of THE COURTS AT GAINEY RANCH" with the Maricopa County Recorder. Attached as Exhibit A to the Declaration was a one-page, single-spaced metes and bounds legal description of the property subject to the Declaration. Attached as Exhibit B was a condominium plat for "The Courts at Gainey Ranch." The plat included two maps of the contemplated condominium development. All of the building numbers were reflected on each map.

On August 16, 1986, Sunland and Drongo entered into a separate subcontract for stucco, labor and materials. The subcontract provided a contract price of $172,000. This figure was determined as the sum of $28,500 each for buildings 1, 3, 4, 5, and 11, $12,714 for building 2 and $16,786 for building 6. The provisions for progress payments and final payment were identical in pertinent part to those under the drywall subcontract of November 13, 1985.

Drongo commenced work on or about November 19, 1985. None of the buildings in the project was at the same stage of construction at any one time. Buildings 7, 8, and 9 were the first to be constructed.

After building 9 was completed, the construction on each succeeding building was completed before construction on the next building was commenced. The order of construction, beginning with the earliest and ending with the latest, was as follows: 7, 8, 9, 10, 5, 6, 4, 11, 3, 1, and 2.

Sunland first commenced drywall work on the project on or about March 17, 1986. Sunland provided drywall labor and materials only on the ramada, sales office, models, and buildings 7, 8, 9, 10, 5, and 6. Sunland first commenced stucco work on the project on or about September 15, 1986. Sunland provided stucco labor and materials only on buildings 5 and 6.

In the trial court the parties stipulated to the following completion dates and charges for drywall, stucco labor, and materials for the ramada and buildings 5, 6, 7, 8, and 9:

| BUILDING | DATE COMPLETED | AMOUNT |
| --- | --- | --- |
| Building 7 | May 5, 1986 | 3,448.73 |
| Ramada | May 15, 1986 | 212.70 |
| Building 8 | July 1, 1986 | 2,089.73 |
| Building 9 | July 18, 1986 | 2,089.73 |
| Building 5 | November 4, 1986 | 6,990.63 |
| Building 6 | January 9, 1987 | 8,032.84 |

The parties agreed that the amounts stated were reasonable within the meaning of A.R.S. § 33–981(B). Sunland also performed drywall work on building 10, which was omitted from the stipulated schedule. Building 10 was completed before January 9, 1987.

In January, 1987, Drongo abandoned the project and filed bankruptcy. Drongo failed to pay a number of subcontractors, including Sunland, for work performed on the project.

On March 4, 1987, the fifty-fourth day following completion of building 6 on January 9, 1987, Sunland recorded and properly served an amended notice and claim of mechanic's and materialmen's lien. The notice and claim of lien consisted of a two-page printed form with two exhibits. The printed form contained a small space calling for "Subject Real Property (Address or Location, City and County)," and a larger space calling for "Subject Real Property (Legal Description)." The "legal description" space referred to a one-page exhibit containing a metes and bounds legal description that was apparently the same in substance as the one appended to the Declaration of Horizontal Property Regime for The Courts at Gainey Ranch. The "address or location" space contained the following words:

7710 Gainey Ranch Road
Scottsdale, Arizona (For specific buildings, see Exhibit A, attached hereto.)

Exhibit A contained the following table:

| BUILDING # | INVOICE # | AMOUNT OWED |
| --- | --- | --- |
| 5 | 6618 | $5,350.00 |
| 5 | 3265 | $2,089.73 |
| 6 | 5227 | $3,357.20 |
| 6 | 5226 | $3,814.07 |
| 6 | 0069 | $1,185.93 |
| 7 | 4982 | $ 75.00 |
| 7 | 4478 | $2,089.73 |
| 8 | 4613 | $2,089.73 |
| 9 | 4685 | $2,089.73 |
| 10 | 4975 | $2,089.73 |
| Models | 5327 | $1,044.00 |
| Sales Office | 4674 | $ 120.00 |
| Sales Office | 4657 | $ 120.00 |
| Ramada | 4684 | $ 212.70 |

Page two of the lien form stated that Sunland had first furnished labor and materials to the job site on March 17, 1986, and that "The building, structure or improvement or the alteration or repair of such building, structure or improvement was completed on not complete."

On or about March 23, 1987, appellee Fidelity & Deposit Company of Maryland issued a statutory discharge of lien bond in the amount of $38,591.33 with appellee DFG named as principal. On April 8, 1987, Sunland filed the instant action seeking damages for breach of contract against Drongo and recovery on the bond pursuant to A.R.S. § 32–1152(E). Sunland's complaint alternatively sought foreclosure of its lien and sale of the real property to satisfy the amounts it alleged were owing to it. Counts II through VII alleged that Sunland had furnished labor and materials in varying amounts on buildings 5 through 10, respectively, of The Courts at Gainey Ranch. Counts VIII, IX, and X contain similar allegations concerning the "models," "sales office," and "ramada" at The Courts at Gainey Ranch.

The parties filed cross-motions for summary judgment. After argument, the trial court asked that the parties obtain, from the title company that had handled the sale of condominium units at The Courts at Gainey Ranch, representative "closing packets" or other documents "to assist the Court in determining whether the Amended Notice and Claim of Mechanic's and Materialmen's Lien, dated March 4, 1987, and the Exhibits attached thereto substantially complied with A.R.S. § 33–993(A)."

The trial court denied DFG's cross-motion for summary judgment and granted Sunland's. It denied Sunland's application for an award of attorney's fees. DFG appealed and Sunland cross-appealed. We have jurisdiction pursuant to A.R.S. § 12–2101(B).

## SUFFICIENCY OF A NOTICE AND CLAIM OF LIEN—GENERAL PRINCIPLES

The portions of A.R.S. § 33–993 pertinent to the issues of this case read:

A. In order to impress and secure the lien provided for in this article, ... [every person other than the original contractor] claiming the benefits of this article, within sixty days after the completion of a building, structure or improvement, or any alteration or repair of such building, structure or improvement, ... shall make duplicate copies of a notice and claim of lien and record one copy with the county recorder of the county in which the property or some part of the property is located, and within a reasonable time thereafter serve the remaining copy upon the owner of the building, structure or improvement, if he can be found within the county. The notice and claim of lien shall be made under oath by the claimant or someone with knowledge of the facts and shall contain:

1. The legal description of the lands and improvements to be charged with a lien.

. . . .

3. A statement of the terms, time given and conditions of the contract, if it is oral, or a copy of the contract, if written.

4. A statement of the lienor's demand, after deducting just credits and offsets.

5. A statement of the date of completion of the building, structure or improvement, or any alteration or repair of such building, structure or improvement.

. . . .

B. For the purposes of subsection A of this section, "completion" means the earliest of the following events:

1. Actual completion of the work.

2. ... occupation or use of the building, structure or improvement by the owner or his agent.

594

The statutes governing mechanic's and materialmen's liens were intended to jealously protect the rights of those claiming under them. *Wylie v. Douglas Lumber Co.*, 39 Ariz. 511, 515, 8 P.2d 256, 258 (1932); *Wooldridge Constr. Co. v. First Nat'l Bank of Arizona*, 130 Ariz. 86, 92, 634 P.2d 13, 19 (App.1981). In *Lewis v. Midway Lumber, Inc.*, 114 Ariz. 426, 561 P.2d 750 (App.1977), the court stated:

> This means that the steps required by A.R.S. § 33–993 to impose the lien must be followed but in determining what these steps are the court will give the words a meaning which is reasonable, consistent with all the language used, and conducive to the purpose to be accomplished by the enactment of the statute. Thus, *substantial compliance not inconsistent with the legislative purpose is sufficient.*

*Id.* at 431, 561 P.2d at 755 (emphasis added). We stated in *Commercial Cornice & Millwork, Inc. v. Camel Constr. Services Corp.*, 154 Ariz. 34, 739 P.2d 1351 (App. 1987):

> Substantial compliance with the mechanics' lien statutes is sufficient if not inconsistent with the overall legislative purpose of the statutes. *The Columbia Group, Inc. v. Jackson*, 151 Ariz. 76, 79, 725 P.2d 1110, 1113 (1986). The purpose of A.R.S. § 33–993 is to give an owner notice of a claim so that it can investigate and determine whether a charge is proper.

*Id.* 154 Ariz. at 37, 739 P.2d at 1354.

## OVERBREADTH OF LEGAL DESCRIPTION

█ Our supreme court has specifically discussed what constitutes substantial compliance with the "legal description" requirement of A.R.S. § 33–993(A). In *Smith Pipe & Steel Co. v. Mead*, 130 Ariz. 150, 634 P.2d 962 (1981), the owner had two adjacent parcels of real property, one directly south of the other. Smith Pipe furnished materials that were incorporated into structures and improvements on the *south* lot. Smith Pipe recorded a notice and claim of lien that precisely stated the legal description of the *north* parcel.

The court held that this invalidated the lien. It noted that in its 1973 amendment to A.R.S. § 33–993(A)(1), the legislature replaced the relatively inexact requirement of a "description ... sufficient for identification" with a requirement for "[t]he legal description of the lands and improvements to be charged with a lien." *Id.* at 151, 634 P.2d at 963. The court held Smith Pipe's "unambiguously erroneous" legal description was not in substantial compliance with the statutes. The court stated:

> [T]he legislature not only added the legal description requirement, but at the same time omitted the "sufficient for identification" language from the old statute. We believe this reflects a legislative intent that substantial compliance with the legal description requirement is necessary in order to perfect a lien. As was aptly stated by the Supreme Court of Idaho in a case with virtually identical facts, "[a]lthough the rule may be different with regard to a description which is merely loose, vague, or ambiguous, where the real property description in a mechanic's lien claim notice is 'unambiguously erroneous' and describes with exactitude the wrong parcel of real property, substantial compliance is not achieved, and the claim of lien is invalid." *Ross v. Olson*, 95 Idaho 915, 917, 523 P.2d 518, 520 (1974).

*Id.*

DFG contends that Sunland's notice and claim of lien was invalid because it contained an overbroad legal description of the real property subject to the lien. DFG asserts that Sunland's lien stated, as the "legal description" required by A.R.S. § 33–993(A)(1), only the metes and bounds description of the entire parcel on which DFG's condominium development was built. DFG argues that Sunland thereby impressed a blanket lien on the entire parcel for work performed on only a portion thereof under two contracts. It concludes that under *Northwest Federal Sav. & Loan v. Tiffany Constr. Co.*, 158 Ariz. 100, 761 P.2d 174 (App.1988) and *Michael Wel-*

*ler, Inc. v. Aetna Casualty & Surety Co.*, 126 Ariz. 323, 614 P.2d 865 (App.1980), the lien was defective and Sunland acquired no rights under it. We disagree.

It is true that the portion of Sunland's lien form that called for the "legal description" of the "subject real property" incorporated by reference the metes and bounds description of the entire subdivided parcel in Exhibit B. However, Exhibit A (attached to the lien form) specifically set forth each building number together with the invoice number and amount owed with respect to each building separately. Only an unreasonably hypertechnical reading of Sunland's lien form would exclude consideration of Exhibit A, from which it is obvious that the lien was to apply only to the buildings and other improvements described, and in the amounts specified. Although the lien form admittedly referred to Exhibit A under the heading of "Subject Real Property (Address or Location, City and County)" rather than under "Subject Real Property (Legal Description)," it is clear from the document as a whole that the metes and bounds description in Exhibit B and the specific designations of buildings and amounts in Exhibit A were to be considered together as the "legal description of the lands and improvements to be charged with a lien" within A.R.S. § 33–993(A)(1). Sunland's lien did not constitute an improper "blanket lien."

## FAILURE TO IDENTIFY SUFFICIENTLY CERTAIN PORTIONS OF DEVELOPMENT TO WHICH LIEN WAS TO ATTACH

■ DFG nevertheless argues that the information detailed on Exhibit A was inadequate to supply a sufficiently definite legal description of the real property subject to Sunland's lien. DFG concedes that, if viewed as including Exhibit A, the legal description in Sunland's lien is not "unambiguously erroneous," such that it would be wholly invalid under *Smith Pipe*. It asserts that the description was at best "loose, vague, or ambiguous." DFG notes that *Smith Pipe* provides no criteria for determining whether a loose, vague or am-

biguous legal description is sufficient under A.R.S. § 33–993(A)(1).

To fill this void, DFG points to the test adopted in *Westinghouse Elec. Supply Co. v. Western Seed Prod. Co.*, 119 Ariz. 377, 580 P.2d 1231 (App.1978), under the less stringent pre–1973 version of A.R.S. § 33–993. In *Westinghouse* we held that the applicable test for "sufficient for identification" was "whether a stranger to the underlying transaction, based upon the description contained in the notice and claim of lien and their general knowledge of the area, could ascertain the property to which the lien attached." *Id.* at 379, 580 P.2d at 1233.

DFG notes that Exhibit A to Sunland's lien lists amounts due for the "models," "sales office," and "ramada," none of which a stranger to the transaction could locate from information in either the recorded plat or Sunland's lien. DFG further asserts that the buildings themselves were never numbered and that the plat does not reflect any building numbers. It concludes that Exhibit A contained insufficient information to constitute an adequate legal description within A.R.S. § 33–993. We disagree.

■ Contrary to DFG's assertion, several of the maps that formed part of the recorded plat for The Courts at Gainey Ranch clearly identify both the unit numbers and the eleven building numbers in the subdivision. Accordingly, any person who looked at Sunland's lien in conjunction with the recorded plat would know exactly which buildings Sunland claimed to have liened. DFG is correct that the designations "models," "sales office," and "ramada" refer to nothing recognizable as such on the plat or, as far as the record indicates, at the site. However, DFG cites no authority for the proposition that these distinct defects in the legal description are sufficient to invalidate the entire lien. We see no legal reason why these defects would have any effect beyond reducing the amount of Sunland's recovery by the sums allocated to the unidentifiable improvements.

## FAILURE TO APPORTION

■ DFG further contends that the rationale of our decision in *Michael Weller* required Sunland to file a separate notice and claim of lien against each of the seventy units in the condominium project. We disagree. There the owner recorded a subdivision plat that created forty-eight residential lots and separate tracts denominated A through M for common use areas and recreation facilities. The owner contracted with Michael Weller, Inc. for drywall and painting work totalling $105,356. The contract allocated this total in different amounts among four distinct groupings of residential lots and common use tracts. The owner obtained individual building permits for each of the forty-eight lots, and individual final inspections were conducted.

Weller recorded a single notice and claim of lien covering only lots one through forty-seven. The notice did not specify what portions of the total claim were due on each of the forty-seven lots subject to the lien, and did not include lot forty-eight or tracts A through M.

This court affirmed summary judgment for the owner and its surety, rejecting Weller's contention that its lien was valid as a blanket lien on a number of lots in a "single project." The court stated:

> Here, the contract entered into between Weller and Homes [the owner] did not constitute a single project in the sense that only one parcel of land was involved (here there are 48 lots subdivided by a recorded plat), or that the improvements were exactly alike on all the lots improved. Rather, the contract by its terms specified that as to the residences, there were four different classes designated in the contract as units A, B, C and A2. *More importantly, the contract covered improvements on other parcels upon which work was performed, but which were not included within the notice and claim of lien. Thus, the notice and claim of lien itself not only treated these other improved parcels (recreation buildings, common areas, and lot 48) differently than the liened 47 lots, thus destroying any single project theory, but the lien attempted to encumber 47 lots for work upon these other parcels.*

> ....

> Given the underlying theory of lien equals benefit bestowed and the statutory requirements that the lien extend only to the property improved and that the lien must specifically describe that property and the amount claimed thereon, at least where the interests of third parties other than the contracting parties are involved, *we hold that a notice and claim of lien which fails to apportion the amount due between the several properties benefited is defective and no rights accrue thereunder.*

*Id.* at 329, 614 P.2d at 871 (emphasis added).

*Michael Weller* does not suggest that a notice and claim of lien may cover more than one lot or parcel only if the affected lots or parcels form part of a "single project" and the lien covers every lot or parcel in the project. In contrast, Sunland did no work on any buildings other than those it liened. Unlike Weller, Sunland apportioned its total claim among each of the buildings or other improvements it worked on in accordance with the price per building set by the subcontract. Finally, the exact amounts claimed to be owed against each individual building were apparent from Sunland's lien with the attached exhibits. Our decision in *Michael Weller* requires no more than this. The "single project" theory is immaterial in determining the validity of an apportioned multi-parcel notice and claim of lien, and applies only in determining the validity of unapportioned ("blanket") liens like those in *Northwest Federal* and *Michael Weller*. See *Northwest Federal*, 158 Ariz. at 103–04 nn. 4–5, 761 P.2d at 177–78 nn. 4–5.[1]

■ DFG also contends that Sunland's lien was invalid under *United Masonry, Inc. v. Jefferson Mews, Inc.*, 218 Va. 360,

---

1. In view of our analysis of the controlling case law, we need not discuss Sunland's contentions concerning the effect of A.R.S. § 33–1257 on its lien.

237 S.E.2d 171 (1977), because Sunland's lien did not distinguish between amounts claimed under Sunland's drywall subcontract and amounts claimed under its stucco subcontract. The rationale of *United Masonry* does not apply here. In that case the contractor had two separate contracts in connection with the construction of a 264–unit condominium development. One contract was for masonry work on 132 of the 264 condominium units. The other was for masonry work on the common elements for the entire development. When the 132 units and the common elements were complete, the owner still owed the contractor approximately $10,000 on the common elements and approximately $34,000 on the condominium units. The contractor thereafter filed a blanket mechanic's lien for $44,000 against all 264 condominium units.

On appeal from dismissal of the contractor's complaint, the court characterized the issue as "whether the blanket mechanic's lien is invalid for failure to apportion the value of the work performed between the individual condominium units and the common element facilities." 218 Va. at 371, 237 S.E.2d at 178. The court said:

> [T]he memorandum does not seek to secure the claim to the extent that plaintiff has added value to the individual units worked on, but attempts to lien other property not benefited by such work.

218 Va. at 378, 237 S.E.2d at 182. The core defect in the lien memorandum in *United Masonry* was its attempt to lien portions of the property that did not benefit from the work that generated the lien. Nothing in *United Masonry* suggests that a single lien can never encompass work done under more than one contract where no lot or parcel is overburdened in comparison to the amount it was actually benefited.

In this case, Sunland apportioned the total sum claimed to be due under each contract exclusively to each of the buildings and improvements to which it provided labor and materials. Sunland's notice and claim of lien did not attempt to lien any property other than that on which it worked. We find nothing in *United Ma-*sonry or any of the Arizona cases that would require us to hold Sunland's lien invalid on the ground that the amounts Sunland claimed against buildings 5 and 6 were not specifically allocated between the drywall and stucco subcontracts. DFG has not claimed to have suffered prejudice from this, and the record suggests none. In our opinion the information contained in Sunland's notice and claim of lien, which included invoice numbers relating to each claimed charge, gave DFG sufficient information to permit it to investigate to determine whether the charges were proper. *See Lewis v. Midway Lumber, Inc.,* 114 Ariz. at 431, 561 P.2d 755.

## TIMELINESS OF RECORDATION

■ DFG contends that if Sunland's lien fulfilled the requirements of A.R.S. § 33–993, it was timely recorded only as to building 6, the only building completed within sixty days before Sunland recorded its notice and claim of lien. DFG posits that each building on which Sunland sought to impress a lien was a "building" within A.R.S. § 33–993(A), and that Sunland was therefore required to record a separate notice and claim of lien within sixty days after the completion date of each building. DFG asserts that Sunland's subcontracts contemplated construction, progress payments and retention payments on a building-by-building basis, and argues that because Sunland expected full payment on completion of each building, it is only reasonable to require Sunland to file separate liens for each building.

Sunland asserts that the condominiums DFG was developing constituted a single "improvement" within the meaning of A.R.S. § 33–993(A). It argues that its recordation of a single notice and claim of lien within sixty days after the completion of building 6 was timely, and operated to impress a lien on all the buildings within the project regardless of their individual completion dates. Sunland relies primarily on *Wahl v. Southwest Sav. & Loan Ass'n,* 12 Ariz.App. 90, 467 P.2d 930 (1970), *approved in part, vacated in part,* 106 Ariz. 381, 476 P.2d 836 (1970). Sunland also argues that

because its lien rights derive from statute and not from contract, the provisions of its subcontracts with Drongo should be disregarded except to the extent they identify the improvements that received the benefits of Sunland's labor and materials.

We recognize that the rights of lien claimants are statutory and not contractual. This does not imply, however, that the terms of a lien claimant's contract must be ignored to the extent Sunland advocates. The case law is to the contrary. *See, e.g., Michael Weller,* 126 Ariz. at 329, 614 P.2d at 871.

Sunland cites the opinion of the court of appeals in *Wahl* as direct authority for the proposition that this multi-building project is a single "improvement" under A.R.S. § 33–993.

The facts in *Wahl* are so different from those in the instant case as to render it inapposite. The construction project in *Wahl* consisted of 24 apartment buildings, not condominium buildings to be divided among separate owners. Only one laundry facility was constructed to serve all 24 buildings. There was no recorded plat of the parcel on which the buildings were constructed at the time construction commenced. Only one building permit was issued *for the entire project. The contract* apparently provided for a lump sum unapportioned price for the entire project. There was a common area for delivery of all construction materials to the project. There was no indication that construction was to proceed, and the contractor was to be paid, on a building-by-building basis. In contrast, the "single project" Sunland posits was the subject of a recorded condominium plat prior to the time construction commenced. Separate building permits were obtained for each building, and separate start orders were issued. The buildings were never at the same stage of construction at any one time. Buildings 7, 8, and 9 were the first to be constructed. After building 9 was completed, the construction on each of the remaining buildings was completed before construction on the next building was commenced. Further, Sunland's billings to Drongo did not encompass the "project" as a whole, but were, as required by the contracts, specific as to the building or buildings actually under construction. The contracts provided for the 10% retention of the completed labor, material, and equipment costs on each building to be paid to Sunland within 30 days after occupancy of any unit in a building and not more than 90 days after acceptance of a building by DFG. There were several units in each of the 11 buildings. A separate settlement was required for each building. Sunland's reliance on *Wahl* is misplaced.

Sunland's reliance on *Northwest Federal* and *Gene McVety, Inc. v. Don Grady Homes, Inc.,* 119 Ariz. 482, 581 P.2d 1132 (1978), for its single project theory, is also misplaced. In *Northwest Federal,* the single project consisted of off-site street improvements for an eight-lot residential subdivision. In *Northwest Federal,* the court stated:

> The three proposals were all directed to the same offsite improvements. Tiffany was paid based on the quantity of materials supplied to the whole project, not to a particular lot.
>
> . . . .
>
> Furthermore, the proposals of Tiffany did not allocate the value of the offsite improvements among the lots.

*Id.* 158 Ariz. at 103–04, 761 P.2d at 177–78. Moreover, *Northwest Federal's* discussion of the single project theory concerned only the question of whether the subdivision lots could be impressed with a blanket (unallocated) lien. Similarly, *Gene McVety* dealt with a water and sewer system benefiting an entire residential subdivision.

In *Gene McVety,* Sun Valley Pipeline, Inc., contracted with Don Grady Homes, Inc., to furnish and install off-site sewer and water improvements for a subdivision. McVety supplied materials to Sun Valley which were used in carrying out Sun Valley's contract with Don Grady Homes. McVety filed a mechanic's lien and thereafter sued to foreclose the lien. In *Gene McVety,* the court stated:

> It is, of course, the rule that two or more contracts cannot be tacked together

so as to extend the time within which a lien notice must be filed. *See, e.g., Potter v. Cline,* 161 Ind.App. 349, 316 N.E.2d 422 (1974); *Settle Builders v. Frankel–Shore,* 42 Ohio Misc. 13, 326 N.E.2d 271 (1974). This case is not, however, governed by the foregoing rule. Where work, distinct in nature, is performed at different times, the law supposes that it is performed under distinct contracts. But when work is done or material furnished, all going to the same general purpose, if the several parts form an entire whole or are so connected together as to show that the parties had it in contemplation that the whole would form but one and not distinct matters of settlement, the whole must be treated as a single contract. *New Prague Lumber & Readi–Mix Co. v. Bastyr,* 263 Minn. 249, 117 N.W.2d 7 (1962). In the instant case, because water and sewers must necessarily be part of the whole of the subdivision, it is reasonable to conclude that Sun Valley and McVety contemplated that the work would form but one account.

Where the materialman does not know of the existence of more than one contract and he furnishes materials to the contractor under a continuing arrangement, his single lien claim for materials furnished will be timely as to all items of material if furnished within the statutory period after the furnishing of the last item, notwithstanding that at the time of filing of the lien notice more than the statutory time had elapsed since the completion of the work called for by one of the contracts. *Gem State Lumber Co. v. School District,* 44 Idaho 359, 256 P. 949 (1927); *Anderson v. Taylor,* 55 Wash 2d 215, 347 P.2d 536 (1959). In *Anderson v. Taylor,* the court said:

'Where the lien claimant is not a party to either of the contracts in question, as where he is furnishing material or labor to a contractor who has two or more contracts with an owner, or to a subcontractor who has two or more subcontracts in connection with the same project, the rule is not applicable unless the lien claimant was aware of the fact that there were two or more contracts.'

*Id.* 119 Ariz. at 485, 581 P.2d at 1135 (quoting *Anderson,* 55 Wash.2d at 217, 347 P.2d at 538).

In the present case, the several parts of the contract do not form an entire whole or are they so connected together "as to show that the parties had it in contemplation that the whole would form but one and not distinct matters of settlement, ..." *Id.* As we have heretofore pointed out, separate building permits were obtained for each building and separate start orders were issued. Separate start and completion dates were contemplated. After the first three buildings were started and completed, at different times, construction on each of the remaining buildings was completed before the construction on the next building commenced. Sunland's billings to Drongo were made separately with regard to each building. Full payment was required to be made to Sunland with respect to each building within 30 days after occupancy of any unit in a building and not more than 90 days after acceptance of a building by DFG. There were several units in each building. Thus, the contract required that full settlement be made separately with respect to each building. The contract contemplated "distinct matters of settlement." The water and sewers in the *Gene McVety* case were required for the whole subdivision. They are not put into place on a building-by-building basis. Furthermore, in *Gene McVety,* a key factor was that the materialman did not know of the existence of possibly two contracts and it furnished materials to the contractor on a continuing arrangement.

Neither *Northwest Federal* nor *Gene McVety* stands for the proposition that under the circumstances of the present case, a group of separately constructed buildings with separate prices, billings, and payments for each building and completed on different dates may be treated as a single "improvement" within A.R.S. § 33–993(A). *Cf. Lewis,* 114 Ariz. 426, 430, 561 P.2d 750, 754 ("improvement" is a catch-all term intended to mean valuable additions or bet-

terments to real estate which do not technically qualify either as "buildings" or "structures").

Although we do not rule out the possibility that a multi-building project could be deemed an "improvement" within the meaning of A.R.S. § 33–993 on appropriate facts, no such facts are present here. The contractual arrangements between the parties in this case, and the manner in which the buildings in DFG's condominium development were actually constructed, require the conclusion that each constituted a separate "building" within A.R.S. § 33–993. Accordingly, building 6 was the only one as to which Sunland's notice and claim of lien was timely filed. The judgment in favor of Sunland must therefore be reduced to the sum of $8,032.84, the amount the parties agreed constituted the reasonable charges owed to Sunland on building 6.

### ATTORNEY'S FEES UNDER A.R.S. § 12–341.01(A)

■ Sunland contends on cross-appeal that the trial court erred in concluding that a successful lien claimant is ineligible for an award of attorney's fees under A.R.S. § 12–341.01(A).[2] In support of this argument, Sunland cites our opinion in *Northwest Federal*, a mechanic's lien priority dispute in which we granted an award of attorney's fees under A.R.S. § 12–341.01(A) without discussion. Relying on *McKesson Chemical Co. v. Van Waters & Rogers*, 153 Ariz. 557, 739 P.2d 211 (App.1987), and *ASH, Inc. v. Mesa Unified School District No. 4*, 138 Ariz. 190, 673 P.2d 934 (App.1983), Sunland argues that attorney's fees are awardable under A.R.S. § 12–341.01(A) in connection with non-contractual claims as long as a contract served as the source or origin of the dispute or where a contract was "the

factor" giving rise to the litigation. Sunland also cites *Ford v. Revlon, Inc.*, 153 Ariz. 38, 734 P.2d 580 (1987), and *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 647 P.2d 1127 (1982) for the proposition that attorney's fees are awardable under A.R.S. § 12–341.01(A) in connection with non-contract causes of action as long as the claim could not exist but for a breach of contract. Sunland argues that its claim arose directly from Drongo's failure to honor its contractual obligation to Sunland, and that it was therefore eligible for an award of attorney's fees under that principle. Sunland also argues that the statute applies because the essential basis of DFG's defense arose out of particular provisions of the contract between DFG and Drongo. We disagree.

In *Northwest Federal*, the parties did not raise the question of whether a mechanic's lien priority dispute constituted an action "arising out of a contract" within A.R.S. § 12–341.01(A). Moreover, one of the three issues before us in *Northwest Federal* was whether the mechanic's lien claim in question had been settled by agreement of the parties before the litigation was commenced. *See generally Northwest Federal*, 158 Ariz. 100, 761 P.2d 174. No similar contractual claim was in issue here. *Northwest Federal* does not support Sunland's cross-appeal.

The other cases on which Sunland relies likewise do not support its cross-appeal. *Ford* and *Sparks* were both tort actions in which the plaintiff's claim, by definition, could not have existed without a breach of an underlying implied contractual duty. In contrast, proof of a breach of contract was not a necessary element of Sunland's claim for recovery under a statutory mechanic's lien. *See* A.R.S. § 33–981(A).

**2.** According to the trial court's minute entries of April 7, 1988, and April 29, 1988, Sunland filed a pleading entitled "Plaintiff's Application for Attorneys' Fees" and DFG filed a pleading entitled "Defendant's Objection to Award of Attorneys' Fees." Neither of these pleadings is included in the record on appeal. The trial court's minute entry of April 29, 1988, denied Sunland's application for an award of attorney's fees "[f]or reasons stated on the record...." Neither side

has provided a transcript of the proceedings of April 29, 1988. It is apparent from a pleading entitled "Reply Re: Plaintiff's Request for Pre-Judgment Interest/Attorney's Fees," a copy of which found its way into the record, that DFG opposed Sunland's request for attorney's fees on the ground that an action for recovery on a statutory lien discharge bond was not one "arising out of a contract" within the meaning of A.R.S. § 12–341.01(A).

Both *McKesson* and *ASH* are distinguishable on their facts. The claim for attorney's fees in *McKesson* arose from an indemnification dispute between the parties to a contract for the sale of a manufactured chemical. 153 Ariz. 557, 739 P.2d 211. *ASH* was a mandamus action seeking to void a school contract. 138 Ariz. 190, 673 P.2d 934.

Division Two of this court has expressly held that an action for foreclosure of a materialmen's lien is not one "arising out of a contract" within A.R.S. § 12–341.01(A). *Cashway Concrete & Materials v. Sanner Contracting Co.,* 158 Ariz. 81, 761 P.2d 155 (App.1988). We fully concur in the following reasoning set forth by the court:

> On plaintiff's cross-appeal, we conclude that its action against those charged with the lien does not arise out of contract. While a breach of the contract between plaintiff [concrete supplier] and Willis [concrete work subcontractor] is a factual predicate to the action, it is not the essential basis of it. Both issues litigated in this case, the validity of the lien and the reasonable value of the material provided, are wholly separate from the contract. They relate to a statutory remedy designed to protect materialmen from those who do not pay their bills. That remedy stands apart from the contract remedy. It exists against those who are foreign to the contract. The action, therefore, does not arise out of the contract.

*Id.* at 83, 761 P.2d at 157 (citations omitted). The fact that DFG chose to rely in part on substantive provisions of the underlying general contract to attempt to limit or defeat Sunland's statutory lien claim does not affect application of the *Cashway* court's analysis in this case. The trial court did not err in denying attorney's fees to Sunland.

The judgment of the trial court is reversed with regard to the ramada, sales office, and models and with respect to the issue of timeliness of recordation except for building 6. The judgment of the trial court is affirmed on all other issues except for the amount of the judgment. This case is remanded to the trial court with directions to enter judgment in favor of Sunland with respect to building 6 only in the amount of $8,032.84.

CONTRERAS, P.J., concurs.

EHRLICH, Judge, concurring in part and dissenting in part.

I concur in the majority opinion except for the section discussing timeliness of recordation. I believe that this portion of the opinion reaches an incorrect result and, therefore, I respectfully dissent from it.

I do not believe that A.R.S. § 33–993 clearly addresses the question in this case; it does not appear to contemplate multi-building construction projects such as the one at issue. The statute states, in pertinent part, that every person, other than the original contractor, "claiming the benefit of this article, within sixty days after the completion of a building, structure or improvement, or any alteration of such building, structure or improvement ... shall" record a notice and claim of lien. A.R.S. § 33–993(A). "Completion" means the earlier of the "[a]ctual completion of the work" or the "occupation or use of the building, structure or improvement by the owner or his agent." A.R.S. § 33–993(B). Sunland Drywall filed its lien against The Courts at Gainey Ranch development, as a single project, within 60 days of the completion of the last building. This case therefore presents the question whether the work undertaken by Sunland Drywall constituted a single "building, structure or improvement," or whether it constituted a series of separate buildings, structures or improvements, each of which had to be the subject of a separate lien.

Arizona courts have repeatedly held that mechanic's lien statutes are remedial in nature and are to be liberally construed in favor of the lienor. *See e.g., Collins v. Stockwell,* 137 Ariz. 416, 418, 671 P.2d 394, 396 (1983); *Gene McVety, Inc. v. Don Grady Homes, Inc.,* 119 Ariz. 482, 486, 581 P.2d 1132, 1136 (1978); *United Pacific Insurance Co. v. Cottonwood Properties, Inc.,* 156 Ariz. 149, 150, 750 P.2d 907, 908

(App.1987). The legislative intent is to protect the person who furnishes the labor or material which enhances the value of another's property by giving him a lien. *Collins, id.* 137 Ariz. at 418, 671 P.2d 394; *Northwest Federal Savings & Loan v. Tiffany Construction Co.,* 158 Ariz. 100, 102, 761 P.2d 174, 176 (1988). The particular purpose of A.R.S. § 33–993(A) is to give notice of a mechanic's lien. *Northwest Federal, id.* We must keep these standards in mind when interpreting the requirements of A.R.S. § 33–993.

In *Gene McVety,* the Arizona Supreme Court addressed the question of whether a contractor had timely filed a lien against a subdivision when the lien was filed within sixty days of actual completion of the project, but more than sixty days after acceptance of the project. The project was covered by several contracts, one of which provided for the work completed after acceptance. In determining what completion date should apply to the filing date for mechanic's liens, the Arizona Supreme Court stated:

> It is, of course, the rule that two or more contracts cannot be tacked together so as to extend the time within which a lien notice must be filed. [Citations omitted.] This case is not, however, governed by the foregoing rule. Where work, distinct in nature, is performed at different times, the law supposes that it is performed under distinct contracts. *But when work is done or materials furnished, all going to the same general purpose, if the several parts form an entire whole or are so connected together as to show that the parties had it in contemplation that the whole would form but one and not distinct matters of settlement, the whole must be treated as a single contract.* [Citation omitted; emphasis added.]

119 Ariz. at 485, 581 P.2d at 1135. The Supreme Court concluded that the trial court had improperly granted summary judgment against the contractor that had filed the mechanic's lien. It found that there was one project, although several distinct contracts were involved.

In this case, the majority is treating a development covered by a single contract as a series of separate projects. Sunland Drywall filed its lien against the buildings constituting The Courts at Gainey Ranch in a timely manner. The contract between Drongo and Sunland Drywall governed all of the work that Sunland was to do on the entire development. There were not separate contracts for each building. Although the contract specified a price for the work to be done on each building, that point is not significant. The contract called for the same price for buildings 1, 3, 4, 5, 7, 8, 9, 10 and 11. The plans appended to the contract show that all of these buildings conformed to the same floorplan. Buildings 2 and 6 and the ramada are smaller and, consequently, they were to be completed for less. Listing the individual buildings in the contract was simply an administrative mechanism to arrive at the total contract price; it did not create twelve separate contracts for work on twelve separate buildings.

Similarly, although Drongo provided Sunland with billing statements for each building, the payment schedule set forth in the contract called for monthly progress payments, not payment for the completion of each building. The retention of 10% of the payment on each building until its acceptance simply is a common mechanism for ensuring that the subcontractors will complete their work satisfactorily; it cannot be accorded great significance.

Finally, the contract taken as a whole indicates that the entire project was to be completed in phases, with each contractor commencing its part of the project upon the preceding contractor's completion. The apparent motive for this arrangement was to keep the number of construction workers on the project site to a minimum in order to avoid the disruption of a neighboring golf course and nearby homes. Thus, the designation of individual buildings in the contract was to facilitate the scheduling of the various phases of construction, not to create separate contracts, or, as the majority contends, separate "settlements" for each building.

Under these facts, the reasoning of the Arizona Supreme Court in *Gene McVety* should apply. We should treat this contract as one providing for work on a single project consisting of a number of units. All of the units were owned by a single developer at the time when the parties entered into the contract. The parties did not contract for the individual buildings separately. Thus, there is no logical reason to require Sunland to have filed a separate lien on each building. The reasons for the contrary finding of the majority—that separate building permits and start orders were obtained for each building, that the buildings were not in the same stage of construction at any given time, that bills were submitted monthly on each building instead of on the project as a whole, and that 10% of the total due on work performed was retained until acceptance of the building—strike me as overly technical and inconsistent with the liberal interpretation of A.R.S. § 33–993 mandated by case law. This was a single project, the subject of a single contract to be executed in phases, and Sunland Drywall was entitled to protect itself through a single lien over all of the buildings on which it did work.

Sunland relies on this court's opinion in *Wahl v. Southwest Savings & Loan Ass'n,* 12 Ariz.App. 90, 95, 467 P.2d 930, 935 (1970), for the proposition that a 24–building project may constitute one improvement. The majority claims that this reliance is misplaced because *Wahl* is factually distinguishable from the present case. I do not find the majority's factual distinctions convincing. I see no reason to distinguish between an apartment complex consisting of several buildings owned by a single entity and a condominium development consisting of several buildings owned by a single entity, later to be sold to individual owners. The remaining distinctions drawn by the majority—the recorded plats, separate permits for each building, designated costs for each building, and lack of a common delivery area—simply are differing administrative details of contracts for different projects. These differences have no bearing on the application of the reasoning found in *Wahl* to the present case.

*Wahl* stands for the proposition for which Sunland cited it, and I believe that it supports a conclusion opposite that reached by the majority.

The majority also attempts to distinguish *Gene McVety* on the basis that it dealt with a water and sewer system benefiting an entire residential subdivision. I cannot agree with their suggestion that a water and sewer system is inherently more a single project than a unitary condominium development. Further, this distinction does not address Sunland's underlying argument that *Gene McVety* sets forth the principles for the treatment of a mechanic's lien with respect to large projects such as this one. *See* 119 Ariz. at 485, 581 P.2d at 1135. As long as the lien in question covers a single project, the nature of that project is immaterial.

There is one further problem with the majority's resolution of this issue. In this case, Sunland Drywall filed a valid, sufficiently descriptive lien against buildings it worked on within a single project within 60 days of the completion of the work specified, yet the majority has found the lien to have been untimely filed through a needlessly technical analysis of the terms of the contract and the building schedule. A contractor is entitled to assume that a single contract for work on a single project can be covered by a single lien. The majority's approach to this case presents contractors with an unworkable standard. Contractors are now forced to guess how the courts might interpret their contracts, and file liens accordingly. This result is clearly not consistent with the intent of A.R.S. § 33–993 or the case law interpreting it.

For the foregoing reasons, I respectfully dissent on the issue of the timeliness of the recordation of the lien.